**ALCO STANDARD CORPORATION**

v.

**Samuel F. BENALAL et al.**

**Civ. A. No. 72-155.**

United States District Court, E. D. Pennsylvania.

June 7, 1972.

As Amended Aug. 3, 1972.

16

Sidney Wickenhaver, Philadelphia, Pa., for plaintiff.

John Carey, New York City, for defendants.

## OPINION AND ORDER

MASTERSON, District Judge.

This is a classic case of complex corporate dealings in which the parties suddenly find themselves embroiled in a major lawsuit which none of them specifically contemplated while formulating any of the agreements.

The chronology of important events (which we have distilled from plaintiff's affidavit) begins in November, 1970 when Samuel F. Benalal, a defendant, visited a booth maintained by the Jackson Products Company, a manufacturer of commercial dishwashers and sub-subsidiary of Alco Standard Corporation (ALCO) at the National Hotel Exposition in New York City. On that occasion, Mr. Benalal spoke with Alan Levin of the Jackson Products Company concerning Mr. Benalal's business activities in Spain and the possibility that ALCO might wish to invest in these enterprises.

Along with his two brothers, Abraham and Ariano, as well as the Investment Holding Fund, a Panamanian corporation, which was itself wholly owned by the three brothers, Samuel F. Benalal owned all of the stock in five Spanish operating companies (Spanish companies) which manufactured various kinds of kitchen and laundry equipment. Specifically, the three Benalal brothers owned 50% of the stock in these five firms while the Investment Holding Fund owned the other 50%. Shortly thereafter, Samuel F. Benalal sent a letter to John T. Vaughan, President of Vaughan Industries, a division of ALCO and the parent of Jackson Products Company, inquiring about "the possibility of incorporating his Spanish companies into the ALCO Standard Corporation."

Mr. Vaughan decided to pursue this potential deal and met personally with Mr. Benalal on February 22, 1971 in Tampa, Florida, the home of Jackson Products Company. At that meeting, Mr. Benalal explained the business of the five Spanish corporations and gave Mr. Vaughan 1969 financial reports for each of them. Mr. Vaughan then asked Mr. Benalal for the 1970 financial reports, but the latter explained that these reports were not yet available but would be forwarded as soon as they were completed.

On March 6, 1971, Mr. Benalal advised Mr. Vaughan that the financial statements for the year ending December 31, 1970 were still not ready, but he did enclose balance sheets for the companies as of September 30, 1970. These balance sheets were signed by Mr. Benalal as President. Then, in late April, Mr. Vaughan traveled to Spain and visited various operations of the Benalal companies in that Country.

On May 12, 1961, Mr. Benalal sent Mr. Vaughan a consolidated balance sheet for all of the Spanish Companies as of December 31, 1970. This document was also signed by Mr. Benalal as President.

The possibility of an acquisition by ALCO of some interest in the Benalals' Spanish Companies increased when, on May 24 and 25, 1971, Mr. Tinkhum Veale, Chairman of the Board of ALCO, and Mr. Vaughan held further discussions with Samuel F. Benalal in Chicago. Three days later, Mr. Vaughan sent a letter to Mr. Benalal which expressed the intention of ALCO to enter into a transaction with the Benalals involving the acquisition by ALCO of a 50% interest in the five Spanish Companies in exchange for 76,000 shares of ALCO common stock worth approximately $1,600,000 plus certain financing and guarantees to the Spanish Companies totaling $2,500,000. This letter of intent was immediately accepted by the three Benalal brothers, the Investment Holding Fund, and the five Spanish Companies. Samuel F. Benalal signed for all of these parties.

From June 18 through the 26, 1971, Samuel F. Benalal visited ALCO's headquarters at Valley Forge, Pennsylvania for the purpose of negotiating and signing a contract which would consummate the acquisition. On June 26, 1971, at Valley Forge, a written agreement ("the Stock Agreement") was in fact entered

into among ALCO, the Benalal brothers and the Investment Holding Fund, providing in part that: (1) the Benalal brothers would transfer their 50% interest in the Spanish Companies to Benalco Espanola, S/A ("Spansub"), a new corporation formed under the laws of Spain in return for all of "Spansub's" stock; and the Investment Holding Fund would transfer its 50% interest in these Companies to Benalal Corporation Standard & Trust Co., Inc. ("Pansub"), another new corporation formed under the laws of Panama in return for all of "Pansub's" stock; (2) ALCO would transfer 76,000 shares of its common stock to the Benalal brothers and the Investment Holding Fund in exchange for 50% of the stock in "Spansub" and "Pansub" respectively. Telescoped, the Benalal's exchanged exactly 50% ownership in their Spanish Companies in return for 76,000 shares of ALCO common stock and certain financial commitments. As with the letter of intent, Samuel F. Benalal executed the "Stock Agreement" on behalf of his two brothers and the Investment Holding Fund. It is also sworn that at the signing, Mr. Benalal submitted to ALCO powers of attorney from his two brothers.

Appended to the "Stock Agreement" was a certification signed by Samuel F. Benalal as "Chief Financial Officer of the [Spanish] Corporations" which stated that:

"The attached unaudited [consolidated] balance sheets of the corporations as of December 31, 1970 and March 31, 1971 and the related unaudited statements of profit and loss . . . have been prepared from the books and records of said corporations . . . and in my opinion, present fairly their financial position at such dates . . . in accordance with generally accepted accounting principles . . ."

In addition, the "Stock Agreement" itself expressly provided under the sub title "Representations and Warranties of the Transferors" that:

"Transferors have furnished ALCO with the Corporations financial statements [which] are correct and complete, have been prepared in accordance with generally accepted accounting principles consistently applied, and fairly present the financial position of the Corporation on the dates indicated . . ."

The actual closing took place on July 23, 1971.

In August, 1971 ALCO arranged for the European accounting firm of Whinney, Murray, Ernst & Ernst, the European affiliate of the American accounting firm of Ernst & Ernst, to conduct an audit of the five Spanish Companies. Apparently, this was the first independent audit of these enterprises that ALCO had arranged. ALCO alleges that from late August until early December, the auditors were unable to complete a report because of inadequate records of the Spanish Companies. As time went on, ALCO became increasingly concerned. This concern turned into alarm when, so it is alleged, Ernst & Ernst confirmed that contrary to Mr. Benalal's representations, the Spanish Companies were previously audited by Price, Waterhouse & Co., but Mr. Benalal had refused to accept their draft opinion.

On January 13, 1972, ALCO finally received a draft opinion of the financial status of the Spanish Companies for the period ending August 31, 1971. But Ernst & Ernst was still unable to certify these statements. On the basis of this opinion, however, ALCO concluded that it had been misled by the various financial representations made by the Transferors in connection with the acquisition. Basically, ALCO believed that profits and assets were materially overstated while important liabilities were not disclosed. Accordingly, this action was commenced on January 21, 1972 against 11 defendants: Samuel F., Abraham and Ariano Benalal, the Investment Holding Fund, "Pansub" and "Spansub," and the five Spanish Compa-

nies; Zocentro, S.A., Zondassa, S.A., Becasa, S.A., Zobalsa, S.C., and Gasalelec, S.A. ALCO seeks (1) *rescission* of the contract, i. e., recovery of its 76,000 shares of common stock in return for its 50% interest in the Spanish Companies; (2) *damages* of $1,000,000 representing loans of $500,000 in cash and $500,000 in bank guarantees to "Pansub" which were extended between August 27, 1971 and October 19, 1971; and (3) *cancellation* of its future contractual obligation to provide "Pansub" with additional loans not to exceed $500,000 and additional bank guarantees not to exceed $1,000,000.

Plaintiff premises entitlement to such relief upon two separate theories. First, ALCO alleges that the defendants made material misleading statements in connection with the sale of a security, thereby violating Section 10(b) [1] of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78j(b) and Rule 10b–5 [2] of the Securities Exchange Commission (17 C.F.R. § 240–160–5). Secondly, ALCO contends that the defendants violated Pennsylvania common law by making false representations and warranties in the Stock Agreement. Jurisdiction over these two causes of action is predicated upon Section 27 of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78aa) and 28 U.S.C. § 1332(a) (2) (Diversity of Citizenship) respectively. We agree that jurisdiction exists over the *subject matter* of this suit on the basis of these statutes.

Defendants, through their attorney, have filed a motion to dismiss on the basis that: (1) under the terms of the Stock Agreement and an Indemnity and Escrow Agreement which was executed a month later on the date of closing, plaintiff is committed to submit all of the claims contained in its complaint to arbitration; (2) this court lacks personal jurisdiction over each of the defendants; (3) a cause of action has not been stated against "Pansub," "Spansub" or any of the five Spanish Companies since it is not alleged that they committed any fraud or made any material misrepresentations in connection with the acquisition; and (4) the plaintiffs are guilty of laches because of undue delay in bringing an action. Alternatively, the defendants move for a more definite statement claiming that the complaint is so vague or ambiguous in certain areas that they cannot reasonably be expected to frame an intelligent answer.

For the reasons developed below, we conclude that defendants' motion to dismiss must be denied in its entirety. We also believe that a more definite statement is not needed in order for the defendants to answer the complaint, rather the details of the allegations are more

---

1. Section 10(b) reads as follows:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule 10b–5 reads:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of insterstate commerce, or of the mails, or of any facility of any national securities exchange.
"(a) to employ any device, scheme, or artifice to defraud.
"(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**20**

appropriately reserved for the discovery process.*

## I. ARBITRATION

At the closing on July 23, 1971, an Indemnity and Escrow Agreement was entered into between Samuel F. Benalal (denominated "The Shareholder") and ALCO. In substance, this Agreement provided that (1) Samuel F. Benalal would place 38,000 shares (½ of the total) in escrow until December 31, 1974; and (2) "the *Shareholder* agrees to indemnify ALCO from and against *all damages defined in paragraph 1(c)* hereof and agree [sic] that the escrow fund deposited herewith *may be used* as collateral for purposes of such indemnification." (Paragraph 2) (emphasis added).

Paragraph 1(c) defines "damages" as:

"Any loss, cost or expense (including, but not limited to, costs and expenses of litigation and attorneys fees, and after deduction of any tax benefits received by any of the corporations with respect to such loss, cost, or expense) deemed to have been incurred by any of the corporations at any time from and after the date hereof as the result of the determination of a Primary Claim in its favor or incurred by any of the corporations as a result of the determination, adversely to any of the corporations, of a third party claim upon which a Secondary Claim has been based." (Emphasis added).

Paragraph 1(a) defines "primary claim" as:

"Any claim made by Alco (the term 'Alco' shall include the Corporations of any other Alco subsidiary) against Shareholder for recovery of any *material breach* (as defined in the [Stock] Agreement) or [sic] *any of the warranties,* or *material breach* (as defined in the Agreement) *in the performance of any of the covenants or agreements* made by the Shareholder in the [Stock] Agreement or by reason of any materially incorrect (as defined in the [Stock] Agreement) *representation* made by the Shareholder in the Agreement." (Emphasis added.)

Finally, the Stock Agreement of June 26th defines "material breach" in paragraph 10 as any claim in excess of $5,000. In short, the provisions of these two Agreements render Samuel F. Benalal (the Shareholder) liable to indemnify ALCO for all damages for any breach of any warranties or covenants made by the Transferors in the Stock Agreement, and the escrow account may be used to satisfy all, or any part of the economic injury that results.

The Indemnity and Escrow Agreement becomes relevant in this case because paragraph 3(f)(iii) states that:

"Alco and the Shareholder . . . . shall respectively have the right to submit any disputed Primary Claim for final determination by arbitration in accordance with the requirements, then obtaining, of the International Chamber of Commerce, Paris, France, in the event a disputed Primary Claim is not settled within thirty (30) days after Alco receives notice that such Primary Claim is disputed."

On the basis of this provision, all of the defendants through their counsel in Paris, initiated an arbitration proceeding before the International Chamber of Commerce on April 14, 1972 (after negotiations with ALCO failed). The defendants maintain that the 10b–5 and common law fraud allegations before this court clearly constitute "a claim for any material breach . . . [of] the warranties . . . made by the Shareholder in the [Stock] Agreements;" and therefore, arbitration under the Escrow Agreement is appropriate. Thus, because the plaintiff is relegated to arbitration, defendants contend that this action should be dismissed.

---

* Defendants' other motion for a bond will be held in abeyance until we hear plaintiff's motion for preliminary relief.

Plaintiff contests this analysis on two important fronts. First ALCO argues that even assuming applicability of this arbitration clause to its allegation of fraud, since only Samuel F. Benalal signed the Indemnity and Escrow Agreements,[3] the other 10 defendants have no basis for demanding a remedy by arbitration, and as to them, this proceeding must continue. Defendants answer this argument, in part, by pointing to paragraph 6.6 of the Stock Agreement which provides:

> "[Before closing] Alco shall have received an escrow and indemnity agreement in the form attached hereto as Exhibit D, *executed by the transferors. . . .*" (emphasis added)

Since the Stock Agreement defines "Transferors" as the *three Benalal brothers and the Investment Holding Fund,* the defendants reason that it was intended that these three defendants would be bound by the Escrow and Indemnity Agreement, even though (unlike the Stock Agreement) they did not actually sign it, either personally or through Samuel F. Benalal pursuant to powers-of-attorney.

We have examined the Stock Agreement and Indemnity and Escrow Agreement and note the apparent inconsistency between them. It is an embarrassing oversight by someone that although the Stock Agreement clearly contemplates that all four Transferors execute the Indemnity and Escrow Agreement, only Samuel F. Benalal's name appears at the end of that Agreement, and only Samuel F. Benalal signed it.

■ Yet we have no doubt as to the proper interpretation of this inconsistency. For whatever reason, only Samuel F. Benalal signed the Indemnity and Escrow Agreement. Consequently, he is the only defendant who may enforce its terms. Lest there be any doubt concerning the parties' intentions in this regard, the Indemnity and Escrow Agreement expressly provides in the opening sentence that the Agreement was "made and entered into among Alco Standard Corporation ("Alco"), an Ohio corporation; the National City Bank of Cleveland, Cleveland, Ohio, ("Escrow Agent") and Samuel Benalal of Madrid, Spain. . . ." This provision simply makes no express or implied reference to Samuel's brothers or the Investment Holding Fund. Thus, as to them, we conclude that because they were neither parties nor signatories to the Indemnity and Escrow Agreement, they may not assert the arbitration clause as a defense to this litigation.[4]

Regarding the other seven corporate defendants, we have not been presented with any cogent theory which would afford them the remedy of arbitration. Even paragraph 6.6 of the Stock Agreement does not help their cause. Because of this theoretical void, we must conclude that an arbitration defense will not excuse them from the case.

Thus, only Samuel F. Benalal remains as a defendant who might possibly assert a defense involving arbitration. Since there is no doubt about the fact that Samuel F. Benalal signed the Indemnity and Escrow Agreement, plaintiff attacks this defendant's right to demand arbitration on a different front. Basically, ALCO seeks to avoid arbitration on the theory that the primary remedy it seeks before us is rescission; but the arbitration panel cannot grant such relief; therefore, this court cannot dismiss the action even as to Samuel F. Benalal.

■ The powers of arbitrators arise out of the agreement (contract) submitting the dispute to them, and they

3. By this we mean that Samuel F. Benalal did not sign the Indemnity and Escrow Agreement on behalf of his brothers or the Fund pursuant to power-of-attorney, nor did these defendants sign the agreement themselves.

4. Indeed, we imagine that these defendants (other than Samuel Benalal) would protest vigorously if in a different setting, *ALCO* asserted that *they* could be forced to arbitration under the terms of the Indemnity and Escrow Agreement.

are limited to act only on those issues and to fashion only those remedies which the agreement itself permits. See Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462, (1962); Butler Products Co. v. Unistrut Corporation, 367 F.2d 733 (7th Cir. 1966); Sley System Garages v. Transport Workers Union of America, 406 Pa. 370, 178 A.2d 560 (1962).[5] Where reasonable doubt exists as to the meaning of the arbitration contract and its terms are susceptible to different constructions, it is the task of the arbitrators to interpret these terms of the agreement. On the other hand, if the agreement clearly includes or excludes particular issues or remedies, a court may so hold without submitting these provisions to arbitration. See Atkinson v. Sinclair Refining Co., supra; Butler Products Co. v. Unistrut Corporation, supra.

■ After careful examination, we find that the Indemnity and Escrow Agreement is not susceptible to a construction which would give the arbitrators the power to order rescission of the Stock Agreement. Nor can they cancel future obligations under the contract. Rather, the arbitrators' remedy is limited exclusively to damages. Such an interpretation flows from the Indemnity and Escrow Agreement which renders Samuel F. Benalal liable to ALCO only for "damages as defined in paragraph 1(c)." Although laden with the suggestion of damages, there is nothing in this critical language which even remotely suggests that the arbitrators could rescind the Stock Agreement, or cancel any of its terms.

■ Counsel for Samuel F. Benalal has cited three cases to support his assertion that the remedy of rescission is somehow indigenous to an arbitration panel. All are inapposite. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the issue was whether fraud in the inducement of a contract was arbitrable where the contract provided that:

"Any controversy or claim arising out of or relating to this agreement, or the breach thereof, shall be settled by arbitration."

As a remedy, the plaintiff sought rescision. The Supreme Court held that the issue was arbitrable, even though it might result in cancellation of the very contract which gave rise to the arbitrators' power. But nothing in *Prima Paint* indicates that any provision of that arbitration agreement covered the question of possible remedies or in any way limited available remedies. In such circumstances, it was reasonable to infer that *all* appropriate remedies were preserved for the arbitrators, particularly where the arbitration clause was exceedingly broad. On the other hand, in a case like the one before us, where the Agreement expressly addresses the subject of remedies, those provisions must control. By the same reasoning, we find the other two cases cited by the defendant, Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2nd Cir.1971) and Coler v. G.C.A. Corp., 331 N.Y.S.2d 938 (Sup.Ct.App.Div.1972) distinguishable from the dispute before us. Consequently, we agree with plaintiff's contention that its case for rescission or cancellation of future contractual obligations may not be dismissed on the basis of the Indemnity and Escrow Agreement.

But this conclusion does not complete our discussion. It is not disputable that the arbitration panel in Paris, France possesses the power to provide the plaintiff with a damage award against Samuel F. Benalal, and that award may include all damages, even if they exceed the value of the escrow. Hence, it becomes arguable that although this Court must retain this matter in order to afford the remedies of rescission and cancellation, if appropriate; we must at the same time permit the arbitration to go

5. The Stock Agreement provides that it shall be interpreted according to Pennsyvania law.

forward since the arbitrators could award damages to the plaintiff, if appropriate. In other words, it is argued that two panels have the power to hear the same evidence and decide the same issues, but by the parties' express agreement, only one has the power to provide relief by way of rescission or cancellation while the other may award damages. Although this seems wasteful of time and resources, if the parties intentionally put themselves in such a position, we have no alternative but to order them to honor their contractual obligations.

Plaintiff seeks to avoid splitting up this case by advancing two arguments. First, ALCO states in its brief that:

"The defendants seek to invoke paragraph 3(F) (iii) which gives either Alco or Samuel Benalal the right to submit disputed primary claims for final determination by arbitration. This right arises, however, *only* in the event that Alco seeks to enforce Samuel Benalal's obligations to indemnify Alco, and does not arise in any other circumstances.

.   .   .   .   .   .

The right of indemnification is essentially consistent with *affirmance* of the contract. . . . What Alco now seeks is *disaffirmance* of the contract. . . . Rescission, therefore, is inconsistent with indemnification. . . . This right [to arbitration] arises *only* in the event that Alco seeks to enforce Samuel Benalal's obligations to indemnify Alco, and does not arise in any other circumstances." (emphasis original)

Although we agree with this statement, it does not respond to the narrow issue at hand. As regards its claim for damages arising out of loans and guarantees to "Pansub" and the five Spanish companies, unquestionably ALCO is seeking *indemnification* from Samuel F. Benalal.

Secondly, plaintiff contends that arbitration (even where the appropriate award is damages) may not go forward because agreements to arbitrate future disputes arising under the Securities and Exchange Act are illegal under Section 29(a) of the Act (15 U.S.C. § 78cc(a). That section reads as follows:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

Alco relies primarily upon the Supreme Court's decision in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In that case, a customer brought an action against a securities brokerage firm to recover damages under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), for alleged misrepresentation in the sale of securities. The defendant brokerage firm asserted that plaintiff's proper forum was before an arbitration panel as provided in the margin agreements which the parties had signed before the sale. The Supreme Court rejected this result and held that an agreement to arbitrate future controversies was void under § 14 of the Securities Act as a "stipulation" binding the customer to "waive compliance" with a "provision of the Act." [6] The Court emphasized that:

"[The Securities Act of 1933 is] [d]esigned to protect investors .   .

[w]hile a buyer and seller of securities, under some circumstances, may deal at arm's length on equal terms, it is clear that the Securities Act was drafted with an eye to the disadvantages under which buyers labor. Issuers of and dealers in securities have better opportunities to investigate and appraise the prospective earnings and business plans affecting securities than buyers. It is therefore

---

6. Section 14 of the Act reads as follows: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

reasonable for Congress to put buyers of securities covered by that Act on a different basis from other purchasers." *Id.* at 431 and 435, 74 S.Ct. at 184 and 187.

Plaintiff acknowledges that it seeks to avoid the arbitration agreement in this case under Section 29(a) of the 1934 Act, whereas Wilko v. Swan voided the arbitration agreement under Section 14 of the '33 Act. Nevertheless, ALCO claims that because the two provisions are virtually identical, the Court's reasoning in Wilko v. Swan ought to apply to Section 29(a) of the '34 Act as well. We agree. See Maheu v. Reynolds & Co., 282 F.Supp. 423 (S.D.N.Y.1967); Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1961).

Although we accept both the applicability of Wilko v. Swan to the '34 Act and the fact that this case involves an agreement to arbitrate future disputes, we are not convinced that the arbitration provision before us is void. All of the cases cited by ALCO, including Wilko v. Swan, involved individual customers suing large brokerage houses. In our opinion, none of these transactions was conducted at arm's length; rather, the customer had no choice but to sign the forms in order to effectuate a purchase. Undoubtedly Congress intended to protect these investors against the misuse of such uneven bargaining power.

But that is not the situation confronting us in this case. Here ALCO and Samuel F. Benalal were both sophisticated parties. Moreover, it was ALCO which wrote both the stock and the Indemnity and Escrow Agreements, and it was ALCO which chose to include an arbitration provision. Under these circumstances, a weak or unsophisticated party is not seeking to avoid a provision written by another, and the investing public is hurt only indirectly through the actions of the officers of their interprise.[7]

But we need not decide this difficult issue because, by a different route, we are convinced that Samuel F. Benalal is not entitled to have the arbitration panel decide the question of damages at this stage. At first, it might appear that the proper result would be to allow the arbitration to proceed as long as damages is the only relief which the panel considers. But further reflection leads to the conclusion that this course is inappropriate since, if the arbitration panel reaches its decision on damages before we act on the issue of rescission, our subsequent decision could render their decision void. This follows from the facts that (1) the arbitrator's power to award damages depends upon the validity of the Stock and Escrow Agreements, and (2) if this Court orders rescission, the award of the arbitrators would be voided, which would make the entire arbitration proceeding a futility. Thus, it does not comport with common sense or the economy of resources to allow arbitration on the issue of Samuel F. Benalal's liability in damages to go forward. For these reasons, we will not dismiss the case as to Samuel F. Benalal on the theory that ALCO's disagreement with him must be the subject matter of an arbitration proceeding.

## II. JURISDICTION OVER THE PARTIES

The defendants vigorously challenge this Court's jurisdiction over them *in personam*. Essentially, the defendants all maintain that they have not experienced "certain minimum contacts with [the territory of the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Although we agree that citizens of foreign countries are entitled to

---

7. We point out, however, that we only question the application of Wilko v. Swan to a factual situation in which a strong and sophisticated party chooses his forum in advance; we do not mean to suggest that even Alco could waive the provisions in Rule 10b–5 in advance.

this standard of protection under the Fifth Amendment,[8] we believe that all of these defendants have done sufficient acts in this Country so as to fall outside of its protective limitations.

For purposes of jurisdiction over the defendants under the Securities and Exchange Act, the relevant question asks what acts they have committed anywhere in the United States since that Act is national in scope. To begin, Samuel F. Benalal negotiated with the plaintiff in New York, Tampa, Chicago and Valley Forge. And at the last location, he signed the critical Stock Agreement on his own behalf, and on behalf of his brothers and the Investment Holding Fund pursuant to powers of attorney. Under these circumstances, we hold that the three Benalal brothers and the Investment Holding Fund clearly had sufficient contacts with the United States to satisfy the requirement of due process. See McGee v. International Life Insurance Co., 355 U.S. 220, 78 S. Ct. 199, 2 L.Ed.2d 223 (1957); International Shoe Co. v. Washington, supra.

For similar reasons, the five Spanish Companies also come within our jurisdiction. Acting as their chief officer, Samuel F. Benalal made certain representations to ALCO in the United States concerning their financial wellbeing. We believe that when a corporate officer comes into a foreign jurisdiction for the purpose of making representations designed to induce someone in that jurisdiction to purchase stock and extend loans and guarantees, the corporation has had sufficient contact with the forum jurisdiction so that suit against it may be brought there.

Finally, concerning "Spansub" and "Pansub," we recognize that their connections with this jurisdiction are more tenuous than those of the other defendants. It is undisputed that "Spansub" and "Pansub" did not actually sign the Stock Agreement at Valley Forge,

Pennsylvania. Nevertheless, plaintiff points out that (1) "Spansub" and "Pansub" were incorporated as a direct result of the Stock Agreement to act as a shell for the Spanish Companies (the operating companies); (2) Samuel F. Benalal acted as President of both of them; (3) certain loans and guarantees of $1,000,000 as contemplated by the Stock Agreement were made to "Pansub"; and (4) ALCO received "Spansub" and "Pansub" stock in return for 76,000 shares of ALCO stock. Thus, formation of "Spansub" and "Pansub" was an essential element in the consummation of this transaction. Plaintiff states that to exercise jurisdiction over all of the defendants except "Spansub" and "Pansub" would be "highly artificial and would ignore the reality of the relationships between the parties." We interpret this as a suggestion that Samuel F. Benalal was in effect acting as "Spansub's" and "Pansub's" representative in his dealings at Valley Forge and elsewhere. Such a theory has plausibility particularly with regard to "Pansub" which was incorporated prior to the signing of the Stock Agreement. If Samuel F. Benalal was in fact acting for these two defendants in this Country, then they certainly have conducted enough business here for this court to exercise jurisdiction over them. In any case, there are enough unanswered questions concerning (1) precisely whom Samuel F. Benalal was representing at Valley Forge and elsewhere; (2) the activities of "Spansub" and "Pansub," if any, in this Country and (3) the transactions involving ALCO and these two corporations which took place between June 26th and closing in late July, such that we will not dismiss either of them at this early stage of the litigation. Of course, these defendants may renew their motions at a later date.

Turning to the state issues of common law fraud, the defendants argue that they have not had sufficient con-

---

8. See Securities and Exchange Commission v. Myers, 285 F.Supp. 743 (S.D.N.Y. 1968); Securities and Exchange Commission v. VTR Incorporated, 39 F.R.D. 19 (S.D.N.Y.1966).

tacts with the State of Pennsylvania such that this Court should acquire jurisdiction over them *vis-a-vis* those state law allegations. Plaintiff retorts with the proposition that once a federal court acquires jurisdiction over a party for purposes of a federal claim, it also acquires jurisdiction over the party for purposes of state claims which arise out of that "common nucleus" of facts, even though the party may *not* have been amenable to jurisdiction in a state court on the *state claims alone*.[9] Cf. In re Penn Central Securities Litigation, 338 F.Supp. 436 (E.D.Pa.1972). But we need not decide this difficult issue of federalism because we believe that the act of signing the Stock Agreement with its appended financial representations (which occurred at Valley Forge) constitutes sufficient contact with Pennsylvania such that an assertion of jurisdiction by that State would not offend defendants' rights to due process of law. Once again, the issue of jurisdiction over "Spansub" and "Pansub" must await the discovery of additional facts concerning the precise parties whom Samuel F. Benalal was representing at Valley Forge.

Defendants' final assault upon our jurisdiction over them *in personam* may be disposed of rather quickly. Precisely stated, they claim that we lack jurisdiction because service of process upon them was improper under the laws of Spain. They have submitted an affidavit from a Spanish jurist which states that the laws of that country require that personal service be made by the official clerk or authorized court clerk of the court having jurisdiction over the defendant in Spain. In this case, it is conceded that service of process was made by someone who was not an official or deputized clerk of any Spanish court.

Although such service may not be effective under *Spanish law*, and consequently any judgment obtained in this Court may not be enforceable in that jurisdiction, the only relevant question for this Court concerns the sufficiency of the service of process under laws of the *United States*. See Securities and Exchange Commission v. Myers, supra. And on this matter, the law is quite clear. Rule 4(e), F.R.Civ.P. provides, in part, as follows:

> "Whenever a statute of the United States * * * provides for service of a summons * * * upon a party not an inhabitant of or found within the state in which the district court is held * * * service may be made under the circumstances and in the manner prescribed by the statute * * * or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule."

Section 27 of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78aa) provides that in addition to the forum district, process "may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found." And Rule 4(i)(1)(C) provides as follows:

> "(1) Manner. When the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not an inhabitant of or found within the state in which the district court is held, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made:
>
> \*  \*  \*  \*  \*  \*
>
> (C) upon an individual, by delivery to him personally, and upon a corporation or partnership or association, by delivery to an officer, a managing or general agent."

---

9. This possibility arises because the scope of the contacts is national for purposes of the federal claims whereas it is limited to Pennsylvania for purposes of the state claims.

Defendants admit that they were all served with a summons and complaint, and we hold that regardless of its effect in Spain, this service will suffice to give us jurisdiction under the laws of the United States.

### III. CAUSES OF ACTION AGAINST THE FIVE SPANISH COMPANIES AND "SPANSUB" AND "PANSUB"

█ The five Spanish companies and "Spansub" and "Pansub" also assert that we should dismiss the action against them for failure to state a claim upon which relief might be granted. They base this request on the contention that the plaintiff has not alleged that these corporations made any misrepresentations proscribed by Rule 10b–5 or Pennsylvania common law. We disagree with this conclusion with regard to the Spanish Companies.

Plaintiff expressly alleges in its complaint that Samuel F. Benalal knowingly submitted false and misleading financial statements to ALCO while acting as the chief officer of the five Spanish Companies. Moreover, the import of the complaint is that these alleged false statements induced the plaintiff to make the stock purchase and extend loans and guarantees. Since the financial statements were apparently critical to ALCO's decision to enter into the acquisition, we think that the plaintiff has adequately alleged that the Spanish Companies participated in deception which occurred "in connection with" the purchase of a security. See Securities and Exchange Commission v. Broadwall Securities, Inc., 240 F.Supp. 962 (D.C. N.Y.1965).

With regard to "Spansub" and "Pansub," we are again faced with uncertainty concerning Samuel F. Benalal's role in representing the various defendants in this Country. We are also faced with uncertainty concerning the legal distinctions between "Spansub" and "Pansub" and the five Spanish Companies. With so many of the same people involved in these seven enterprises, it may turn out that representations made by the five Spanish Companies may also be attributable as a matter of law to the two parent holding companies. Thus, we will deny "Spansub's" and "Pansub's" motions to dismiss for failure to state causes of action against them. They may, however, renew these motions at a later date.

### IV. LACHES

█ As a final theory to support their motion to dismiss, the defendants assert that plaintiff is guilty of laches in bringing this action. They argue that although ALCO had knowledge of the alleged misrepresentations on June 26, 1971, it waited almost seven months to commence this litigation. As a result of this delay, defendants claim that they will now suffer injury if the acquisition is set aside.

ALCO vigorously denies that it had knowledge (or should have had knowledge) of the true financial condition of the defendants before late December, 1971 or early January, 1972. Moreover, ALCO denies that the defendants relied on such delay to their detriment. Under these circumstances, an essential factual dispute exists which a jury must resolve, and therefore we cannot rule on the question of laches as a matter of law. Compare Coughlin v. Ryder, 260 F.Supp. 256 (E.D.Pa.1966).