556 F.2d 406
 194 U.S.P.Q. 10
 WELLS FARGO & COMPANY, a corporation, and Baker Industries,
Inc., a corporation, Plaintiffs-Appellants,
v.
WELLS FARGO EXPRESS COMPANY, a corporation, and Wells Fargo
Express Company, AG, a Liechtenstein Corporation,
Defendants-Appellees.
 No. 74-2109.
 United States Court of Appeals,
Ninth Circuit.
 April 22, 1977.
 
 Richard E. Backus, argued, Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Cal., for plaintiffs-appellants.
 Wiener, Goldwater, Galatz & Raggio, Las Vegas, Nev., Albert L. Jacobs, Jr., Jacobs & Jacobs, New York City, for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before WRIGHT and CHOY, Circuit Judges, and EAST,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 A show-down over rights to the storied name "Wells Fargo" is the subject of this trademark infringement and unfair competition action. Two American corporations challenge the use of the name, in the United States and abroad, by two other corporations, one of which is foreign.
 
 
 2
 In a lengthy opinion appearing at 358 F.Supp. 1065 (D.Nev.1973), the district court held, among other things, that it lacked personal jurisdiction over the foreign defendant and that those portions of the suit concerning activities in foreign countries should be dismissed for want of subject matter jurisdiction and under the doctrine of forum non conveniens. Plaintiffs appeal. We vacate the judgment of the district court on these issues and remand.
 
 Facts and Proceedings Below
 
 3
 Plaintiff Wells Fargo & Company, a California corporation, is engaged in various businesses in the United States and abroad, most notably as Wells Fargo Bank. In addition to world-wide banking and trust services, the company is also involved in toy manufacture, the restaurant trade, and the travel agency business. In each of these endeavors, it makes use of trade names, trademarks, and service marks which consist in whole or in part of the name "Wells Fargo," and which are registered in the United States under the Lanham Act, 15 U.S.C. §§ 1051-1127, and in various foreign countries. The other plaintiff, Baker Industries, Inc., is a Delaware corporation which owns and has registered the "Wells Fargo" trademark for use in its business of providing armored car and other protective services.
 
 
 4
 At the heart of plaintiffs' allegations[1] is the claim that a group headed by Herman Heymann, a German national who resides in Gibraltar, has deliberately and wrongfully attempted to appropriate the "Wells Fargo" name both in Europe as well as in the United States. Defendant Wells Fargo Express Company, A.G. ("A.G."), a Liechtenstein corporation, was incorporated in 1967 by Heymann to engage in the business of loaning money and is the foreign defendant dismissed by the district court below. In the course of its activities, A.G. had acquired various European and American subsidiaries. While none of the European subsidiaries has been named in the instant action,[2] an American subsidiary, Wells Fargo Express Company ("Express"), is a named defendant.
 
 
 5
 Express was originally incorporated in Nevada in 1961 for the purpose of providing traveler's checks under the name "Wells Fargo" by K. F. Wilkinson, Sr., a business associate of Heymann, but from that date until 1968 it lay dormant. In 1968, the only capital stock of Express was issued to A.G. for a consideration of $50,000. What business Express has done appears to be in the area of research and development, including the invention and marketing of electronic protective devices.
 
 
 6
 Express was the only defendant named when plaintiffs filed their original complaint on September 18, 1970, seeking damages as well as injunctive relief. Approximately three weeks later, its name was changed to Modern Research, Inc. On November 2, 1970, A.G. transferred all of its outstanding shares in Express to Albert L. Jacobs, Jr., Express' attorney in this case, for a consideration of $100.[3] The Nevada district court found that it had both in personam jurisdiction over Express and subject matter jurisdiction over plaintiffs' trademark infringement and unfair competition claims against Express. See 358 F.Supp. at 1079-84. The propriety of those rulings is not now before us.
 
 
 7
 A.G. was not named as a defendant until plaintiffs filed their amended complaint of December 22, 1971, seeking the same relief. Service was made on A.G. in Liechtenstein pursuant to Fed.R.Civ.P. 4(e) & 4(i)(1)(D), and the Nevada "long-arm" statute, Nev.Rev.Stat. § 14.065. A.G. received the summons as shown by the return of service required by Rules 4(g) & 4(i)(2). Through a letter from its Belgian counsel, however, A.G. notified the Nevada district court of its intention not to appear, maintaining that the court lacked jurisdiction over it and its activities.[4]
 
 
 8
 In its opinion of April 10, 1973, the district court held that its previous order giving plaintiffs leave to add A.G. as a party had been improvidently granted. 358 F.Supp. at 1110. In addition to concluding that it was without personal jurisdiction over A.G., id. at 1078, 1108-10, the district court also held that it lacked subject matter jurisdiction under the federal question grant of the Lanham Act, 28 U.S.C. § 1338(a), over plaintiffs' claims concerning the foreign activities of A.G., and that even though diversity jurisdiction was available to plaintiffs, 28 U.S.C. § 1332, such a suit would be dismissed under the doctrine of forum non conveniens because of the difficulty of applying foreign law. 358 F.Supp. at 1074-78. Plaintiffs appeal these rulings.
 
 
 9
 I. IN PERSONAM JURISDICTION OVER A.G.
 
 
 10
 The district court held that Express, which was incorporated and doing business in Nevada, was clearly present in that state and was, therefore, subject to service of process under Fed.R.Civ.P. 4(f).[5] The court, however, denied personal jurisdiction over A.G., ruling only that under Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), and Gravely Motor Plow & Cultivator Co. v. H. V. Carter Co., 193 F.2d 158, 160-61 (9th Cir. 1951), the mere ownership by a foreign corporation of a company which is doing business in the state does not mean that the foreign parent itself is "doing business" there so as to render itself liable to process. See 358 F.Supp. at 1108-10. In its discussion of personal jurisdiction over A.G., however, the district court seems to have focused only on one aspect of A.G.'s activities its ownership of Express and, in doing so, may have misconstrued both the law of in personam jurisdiction and the import of plaintiffs' admittedly confusing arguments.
 
 
 11
 In International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny, the Supreme Court has attempted to define the constitutional due process limits of in personam jurisdiction. In these cases, the Court has made it clear that two principal factors must be considered in determining whether a court may constitutionally exercise personal jurisdiction over a given corporate defendant: the significance of the defendant's contacts with the forum and the relationship of the cause of action to those forum contacts. L. D. Reeder Contractors of Ariz. v. Higgins Indus., 265 F.2d 768, 774-75 (9th Cir. 1959); Blount v. Peerless Chemicals (P.R.), Inc., 316 F.2d 695, 697-98 (2d Cir.), cert. denied sub nom. Colbert v. Peerless Chemicals (P.R.), Inc., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963).
 
 
 12
 International Shoe itself required that a non-resident defendant's "operations establish sufficient contacts or ties with the state of the forum to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state to enforce the obligations which (defendant) has incurred there," and that the form of "substitute service adopted there gives reasonable assurance that the notice (to defendant) will be actual." 326 U.S. at 320, 66 S.Ct. at 160. This "minimum contacts" test was elaborated upon in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), where a single contact with the forum state was held to be sufficient given the balance of the hardships to the plaintiff and defendant in litigating elsewhere. In Hanson v. Denckla, 357 U.S. 235, 254, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), however, the Court cautioned that a court "does not acquire that jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation." It held that
 
 
 13
 (t)he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
 
 
 14
 Id. at 253, 78 S.Ct. at 1239.
 
 
 15
 In a parallel development, the Supreme Court decided Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), holding that, where a corporation carries on "continuous and systematic corporate activities" within a state, due process neither prohibits nor compels a state to accept in personam jurisdiction over it even when the "cause of action (did) not aris(e) out of the corporation's activities in the forum state." Id. at 446, 72 S.Ct. at 418.
 
 
 16
 The rules which emerge from these cases may be summarized as follows: If the defendant corporation has sufficient deliberate "minimum contacts" with the forum state, a court may acquire in personam jurisdiction over it in actions which arise from those forum contacts. If, however, a corporation's activities in the forum are so "continuous and systematic" that the corporation may in fact be said already to be "present" there, it may also be served in causes of action unrelated to its forum activities.[6] See O'Neal v. Hicks Brokerage Co., 537 F.2d 1266 (4th Cir. 1976); King v. Hailey Chevrolet Co., 462 F.2d 63, 66-67 (6th Cir. 1972); Ratliff v. Cooper Laboratories, Inc., 444 F.2d 745 (4th Cir.), cert. denied, 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 2652 (1971); Eyerly Aircraft Co. v. Killian, 414 F.2d 591, 595-98 & n.7 (5th Cir. 1969); Southern Machine Co. v. Mahasco Indus., Inc., 401 F.2d 374, 376-77, 380-83 (6th Cir. 1968); Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 440 (1st Cir.), cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); Aftanase v. Economy Baler Co., 343 F.2d 187, 196-97 & n.2 (8th Cir. 1965); Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 550-54 (4th Cir. 1965). See generally F. James, Civil Procedure § 12.8 (1965); 2 J. Moore, Moore's Federal Practice P 4.25(5), at 1171-73 (2d ed. 1976); 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1067 (1976).
 
 
 17
 In addition to not violating these due process limits, however, a court's exercise of in personam jurisdiction must, of course, be affirmatively authorized by the legislature. See Amba Marketing Systems, Inc. v. Jobar Int'l, Inc., 551 F.2d 784, 787 (9th Cir. 1977); Hardy v. Pioneer Parachute Co., 531 F.2d 193, 195 (4th Cir. 1976); Rebozo v. Washington Post Co., 515 F.2d 1208, 1211 (5th Cir. 1975); Davis H. Elliot Co., Inc. v. Caribbean Utils. Co., Ltd., 513 F.2d 1176, 1179 (6th Cir. 1975); George v. Strick Corp., 496 F.2d 10 (10th Cir. 1974). The Federal Rules of Civil Procedure provide for personal service "anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state." Fed.R.Civ.P. 4(f). Under Rule 4(d)(3), personal service "upon a domestic or foreign corporation" is effected by serving "an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . . ." Rule 4(d)(7) authorizes service upon a corporation "in the manner prescribed by any statute of the United States or in the manner prescribed by the law of the state in which the district court is held. . . . " Under Rule 4(e)(1), "service may . . . be made under the circumstances and in the manner prescribed in (a) statute (of the state in which the district court is held)." See also Rule 4(i)(1) (manner of service in foreign country under circumstances authorized by state law adopted pursuant to Rule 4(e) ).
 
 
 18
 Thus, the federal district court of Nevada may, reading Rules 4(d)(7) & 4(e) together, also service out-of-state defendants by availing itself of the in personam jurisdictional statutes of Nevada. Cook v. Fox, 537 F.2d 370, 371 (9th Cir. 1976); Cutten v. Allied Van Lines, 514 F.2d 1196, 1198 (9th Cir. 1975); Threlkeld v. Tucker, 496 F.2d 1101, 1103-04 (9th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); Wright v. Yackley, 459 F.2d 287, 288 (9th Cir. 1972). Nev.Rev.Stat. § 14.065 provides both the manner and circumstances in which an out-of-state defendant will be subject to service:
 
 
 19
 1. Personal service of summons upon a party outside this state is sufficient to confer upon a court of this state jurisdiction of the person of the party so served if:
 
 
 20
 (a) Such service is made by delivering a copy of the summons, together with a copy of the complaint, to the party served in the manner provided by statute or rule of court for service upon a person of like kind within this state; and
 
 
 21
 (b) Such party has submitted himself to the jurisdiction of the courts of this state in a manner provided by this section.
 
 
 22
 2. Any person who, in person or through an agent or instrumentality, does any of the acts enumerated in this subsection thereby submits himself and, if an individual, his personal representative to the jurisdiction of the courts of this state as to any cause of action which arises from the doing of such acts:
 
 
 23
 (a) Transacting any business or negotiating any commercial paper within this state;
 
 
 24
 (b) Committing a tortious act within this state;
 
 
 25
 (c) Owning, using or possessing any real property situated in this state;
 
 
 26
 (d) Contracting to insure any person, property or risk located within this state at the time of contracting; or
 
 
 27
 (e) Living in the marital relationship within this state notwithstanding subsequent departure from this state, as to all obligations arising for alimony, child support or property settlement, if the other party to the marital relationship continues to reside in this state.
 
 
 28
 3. Only causes of action arising from these enumerated acts may be asserted against a defendant in an action in which jurisdiction over him is based on this section.
 
 
 29
 4. The method of service provided in this section is cumulative, and may be utilized with, after or independently of other methods of service.
 
 
 30
 This statute is in the broad, modern pattern of so-called "long-arm " statutes. Although there is not an extensive body of state law construing its reach, it is clear that the Nevada Supreme Court has read the statute liberally as affording jurisdiction to the fullest extent consonant with the due process limits of the United States Constitution. Abbott v. Second Judicial District Court, 90 Nev. 321, 526 P.2d 75, 76 (1974); Certain-Teed Products Corp. v. Second Judicial District Court, 87 Nev. 18, 479 P.2d 781, 784-85 (1971).
 
 
 31
 Several distinct theories may be gleaned from plaintiffs' many arguments concerning how A.G. can be subjected to the in personam jurisdiction of the federal district court in Nevada, and they may conveniently be grouped into two broad categories. First, plaintiffs contend that A.G., both by itself and through Express acting as its "agent," had sufficient "minimum contacts" with Nevada to be reached under that state's long-arm statute, at least as to causes of action which arise from those contacts. Second, they seem to argue that A.G. itself is already "present" in Nevada and, thus, is subject to the general personal jurisdiction of the district court there regardless of where the activities giving rise to their causes of action took place because Express is clearly "present" there. We take up these arguments in turn.
 
 A. A.G.'s "Minimum Contacts" with Nevada
 
 32
 Plaintiffs suggest that the district court may have confused the significance of "contacts" with the forum required, on the one hand, to satisfy the general jurisdictional standard for "presence" within the state with those necessary, on the other hand, to meet the less-stringent "minimum contacts" test for limited long-arm jurisdiction. They argue that, even if A.G.'s activities within Nevada were not so "continuous and systematic" as to lead to the conclusion that it was "doing business" there, these activities were sufficient to meet the requirements of due process and the "transacting any business" or "committing a tortious act" tests of Nev.Rev.Stat. § 14.065(2) (a) & (b). They further maintain that trademark infringement, unfair competition, and other causes of action clearly arise from these "minimum contacts" with Nevada.
 
 
 33
 1. A.G.'s Own "Minimum Contacts" with Nevada
 
 
 34
 First, plaintiffs point to a $10,000 loan to Express from A.G., which is in the business of making loans under the name Wells Fargo Express, A.G. They claim that the loan contract was negotiated and consummated by agents of A.G. who traveled to Nevada for that purpose, and that such in-state activity gives rise to one count of the instant causes of action. See, e.g., Republic Int'l Corp. v. Amco Engineers, Inc., 516 F.2d 161, 167-68 (9th Cir. 1975); Davis H. Elliot Co., Inc. v. Carribbean Utils. Co., Ltd., 513 F.2d 1176, 1182 (6th Cir. 1975); Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 494-96 (5th Cir. 1974); O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176-77 (7th Cir. 1971); Thompson v. Ecological Science Corp., 421 F.2d 467 (8th Cir. 1970); Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951, 954-55 (2d Cir. 1967).
 
 
 35
 Such a purposeful single contact is clearly sufficient to satisfy the constitutional test for "minimum contacts" when the cause of action arises from that contact. McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Jones Enterprises, Inc. v. Atlas Service Corp., 442 F.2d 1136, 1139-40 (9th Cir. 1971); Great American Ins. Co. v. Katani Shipping Co., 429 F.2d 612, 614 & n.6 (9th Cir. 1970); Duple Motor Bodies, Ltd. v. Hollingsworth, 417 F.2d 231, 234-35 (9th Cir. 1969); Dragor Shipping Corp. v. Union Tank Car Co., 361 F.2d 43, 48-49 (9th Cir.), cert. denied, 385 U.S. 831, 87 S.Ct. 68, 17 L.Ed.2d 66 (1966); L. D. Reeder Contractors of Ariz. v. Higgins Indus., 265 F.2d 768, 773 (9th Cir. 1959). Plaintiffs would seem to have a claim for trademark infringement and unfair competition growing out of this loan, and the activity of making the loan may, in this case, be characterized as either the transaction of business or the commission of a tortious act in Nevada for purposes of Nev.Rev.Stat. § 14.065(2)(a) & (b). A single infringing or unfair act is sufficient to state a trademark or unfair competition cause of action, Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87, 93-94 (9th Cir. 1963), and Nevada adopts the single contact rule, Metal-Matic, Inc. v. Eighth Judicial District Court,82 Nev. 263, 415 P.2d 617 (1966).
 
 
 36
 2. Aggregation of A.G.'s United States Contacts
 
 
 37
 Next, plaintiffs argue that where, as here, the court is to determine whether it has personal jurisdiction over an alien defendant who is being sued on a claim arising under federal law, it may appropriately consider not only the alien defendant's contacts with the forum state, but also the aggregate contacts of the alien with the United States as a whole. See 2 J. Moore, Moore's Federal Practice P 4.25(5), at 72 n. 1 (Supp.1976). In this regard, plaintiffs point to two substantial loans made by A.G. in California. Although it is somewhat unclear, plaintiffs apparently hope to have the court consider these California transactions not only to buttress their argument that A.G. may be served from Nevada and sued there on the one Nevada loan, but also to establish their right to sue A.G. in Nevada for its two California loans as well.
 
 
 38
 Given our holding that a single act within Nevada is a sufficient "minimum contact" on which to base service on A.G. from Nevada for an action which arises out of that Nevada activity, we need not discuss the validity of plaintiffs' aggregation theory for the former purpose. Since, however, plaintiffs also seem to demand that they be allowed to sue A.G. in Nevada on claims growing out of the California loans, it is necessary to discuss their contentions.
 
 
 39
 It might very well be neither unfair nor unreasonable as a matter of due process to aggregate the nonforum contacts of an alien with his forum contacts or to require an alien to litigate in one state both those causes of action which originate in that forum state and those arising elsewhere in the United States.[7] Considering the relative distances between Liechtenstein and Nevada, on the one hand, and Nevada and California, on the other, due process may indeed not be a barrier to the adoption of plaintiffs' aggregation theory in the instant suit. What plaintiffs overlook, however, is that, not only must the requirements of due process be met before a court can properly assert in personam jurisdiction, but the exercise of jurisdiction must also be affirmatively authorized by the legislature. It is because of this factor that one case relied upon by the plaintiffs to support their aggregation theory, Engineered Sports Prods. v. Brunswick Corp., 362 F.Supp. 722, 728 (D.Utah 1973), is distinguishable, while a second case cited by them, Cryomedics, Inc. v. Spembly, Ltd., 397 F.Supp. 287, 290-92 (D.Conn.1975), is of dubious validity.
 
 
 40
 In Engineered Sports, plaintiffs sued various European manufacturers of ski boots for patent infringement in the federal court in Utah. The court held that it could consider all United States contacts of defendants in determining whether to exercise in personam jurisdiction over them (apparently for all their American activities) under Utah's long-arm statute. Although the court's language is expansive, the rationale for its holding was not simply that defendants were aliens and that plaintiffs' cause of action was federal. Rather, the court relied on Utah Code Ann. § 78-27-24(3), which confers long-arm jurisdiction over a defendant who caused "any injury within the state" when claims "arising from" that in-state injury were sued upon, to hold that plaintiffs, "whose business is relatively localized" in Utah, suffered injury there through defendants' worldwide activities. 362 F.Supp. at 728.[8] Compare Engine Specialities, Inc. v. Bombardier, Ltd., 454 F.2d 527, 529 (1st Cir. 1972); American Eutec. Weld. Alloys S. Co. v. Dytron Alloys Corp., 439 F.2d 428, 432-35 (2d Cir. 1971).
 
 
 41
 The Nevada long-arm statute involved in the instant suit contains no such "causing of injury within the state" provision. Nev.Rev.Stat. § 14.065 clearly contemplates that only causes of action "arising from" enumerated " acts" which took place "within" Nevada may be reached. There is no indication that any "acts" material to A.G.'s two California loans took place in Nevada. Moreover, even though a clause identical to Utah's commission of a "tortious act within the state" provision has been read to cover tortious conduct which results in economic injury in the forum state, Honeywell, Inc. v. Metz Apparatewerke, 509 F.2d 1137, 1142-43 (7th Cir. 1975), there is no allegation here that the injury to either of the instant plaintiffs' profits is somehow uniquely located in the forum state as was that suffered by the plaintiffs in both Engineered Sports, 362 F.Supp. at 728, and Honeywell,509 F.2d at 1144. See Spectacular Promotions, Inc. v. Radio Station WING,272 F.Supp. 734, 737 (E.D.N.Y.1967). See also Duple Motor Bodies, Ltd. v. Hollingsworth, 417 F.2d 231, 233 (9th Cir. 1969).
 
 
 42
 In Cryomedics, Inc. v. Spembly, Ltd., 397 F.Supp. 287, 290-92 (D.Conn.1975), the second case relied upon by plaintiffs for their aggregation theory, the district court of Connecticut held that all of the British defendants' American activities could be aggregated to establish in personam jurisdiction over them in Connecticut because that state's long-arm statute had been construed by state courts to extend to the limits of due process and the constitution did not forbid such aggregation. See 397 F.Supp. at 288. The court does not quote the provisions of the applicable Connecticut statute, Conn.Gen.Stat. § 33-411, but a reading of that act reveals that, like the Nevada statute at issue here, see Jackson v. Continental Trailways, Inc., 65 F.R.D. 451, 456, 460 (D.Nev.1974), it too is limited to granting personal jurisdiction for causes of action "arising from" activities which took place "in" the forum state. The fact that courts have interpreted the words of the Connecticut statute liberally does not mean that the express legislative requirements themselves may be ignored in the course of that interpretation. See George v. Strick Corp., 496 F.2d 10 (10th Cir. 1974); Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 491-92 (5th Cir. 1974); Time, Inc. v. Manning, 366 F.2d 690, 694 (5th Cir. 1966). But see Fulton v. Chicago, Rock Island & Pacific R. R., 481 F.2d 326, 334 n. 5 (8th Cir.), cert. denied, 414 U.S. 1040, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973). And, unlike some state long-arm statutes, see, e. g., Cal.Civ.Proc.Code § 410.10, construed in Republic Int'l Corp. v. Amco Engineers, Inc., 516 F.2d 161, 166-67 (9th Cir. 1975), apparently neither the Connecticut nor the Nevada act contains a catch-all clause granting in personam jurisdiction in all instances which would not violate due process.
 
 
 43
 The problem of lack of statutory authorization is clearly pointed up by Edward J. Moriarity & Co. v. General Tire & Rubber Co., 289 F.Supp. 381 (S.D.Ohio 1967), a case relied upon by the Cryomedics court. While that opinion does contain extensive dicta concerning the constitutional and pragmatic validity of the aggregation theory, see 289 F.Supp. at 389-90, it concludes the discussion as follows:
 
 
 44
 Unfortunately, this course has not been left open to us by the federal rules or statutes. That is, neither Congress nor the Supreme Court has provided statute or rule whereby substituted service may be made (in a Sherman Act suit) upon an alien corporation having minimum contacts with the United States. And when substituted service is made pursuant to a state long-arm statute, as it was in this case, then the rules provide that service be made "under the circumstances and in the manner prescribed by the statute * * *," Rule 4(e)(2) (sic 4(e)(1)), F.R.Civ.P. (emphasis added).
 
 
 45
 We take the italicized portion to mean that when service is made pursuant to a state long-arm statute, it is only proper when the corporation served meets the qualifications for service set out in that statute.
 
 
 46
 289 F.Supp. at 390 (footnote omitted). See also First Flight Co. v. National Carloading Corp., 209 F.Supp. 730, 736-39 (E.D.Tenn.1962) (discussing the constitutionality of aggregating United States contacts in all suits based on a federal cause of action).[9]
 
 
 47
 If policy considerations do indeed dictate that an alien defendant's contacts with the entire United States should be aggregated, and if the Constitution does not forbid such a practice at least where the plaintiff is suing in federal court on a federal cause of action, the Federal Rules should be amended to authorize such a practice. Such a step is, however, not ours to take. See AG-Tronic, Inc. v. Frank Paviour, Ltd., 70 F.R.D. 393, 400-01 (D.Neb.1976) (criticizing and refusing to follow the broad rule of Cryomedics ). See generally 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1075, at 304 n.29 (1976); von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1123-25 n. 6 (1966); Note, 9 Vand.J.Transnat'l L. 435, 444-45 (1976), noting Cryomedics, Inc. v. Spembly, Ltd., 397 F.Supp. 287 (D.Conn.1975).[10]
 
 
 48
 Finally, such aggregation of an alien's American contacts may already be proper when a federal statute authorizes world-wide service of process, see, e. g., 15 U.S.C. §§ 22, 25, 77v, 78aa; 28 U.S.C. § 1655, and, therefore, the only relevant constraint is fifth amendment due process rather than statutory authorization. See, e. g., Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d. 1326, 1339-41 (2d Cir. 1972); Alco Standard Corp. v. Benalal, 345 F.Supp. 14, 25-27 (E.D.Pa.1972). See also Mariash v. Morrill, 496 F.2d 1138, 1142-43 (2d Cir. 1972) (nonalien defendant). But not all federal statutes which grant a federal right to recovery and provide for suit in federal court contain an additional provision granting such broad service of process powers. The Lanham Act, presently before us, apparently does not. See 15 U.S.C. §§ 1114-20 (remedies) & 1121 (subject matter jurisdiction).
 
 
 49
 Since the district court's power to exercise in personam jurisdiction is limited here to that provided by the Federal Rules of Civil Procedure and, through them, the laws of the state of Nevada, plaintiffs may not, absent defendants' "presence" in Nevada or a waiver of the objection by them, litigate in the Nevada district court their trademark infringement and unfair competition claims arising out of A.G.'s two California loans.
 
 
 50
 3. Express as the Nevada "Agent" of A.G.
 
 
 51
 In addition to reaching A.G. through Nevada's long-arm statute for its own activities as discussed above, plaintiffs maintain that A.G. may be served under that statute for the actions of Express. They allege that the Nevada activities of Express[11] out of which their claims for trademark infringement and unfair competition arise were conducted by Express at the behest, and under the control, of A.G. and are, therefore, imputable to it. Thus, they conclude, for purposes of those activities, Express was the "agent" or "instrumentality" of A.G. in Nevada and, therefore, A.G. may be served pursuant to the express language of Nev.Rev.Stat. § 14.065(2).[12]
 
 
 52
 While Nevada courts do not appear to have attempted to define the statutory terms "agent" and "instrumentality," several other courts have recognized the existence of such a relationship as a basis on which, consistently with due process and the long-arm statutes before them, the principal may be served for the in-state actions of the agent. Corporations, of course, can only act through agents, and either an individual person, see, e. g., Davis H. Elliot Co., Inc. v. Caribbean Utils. Co., Ltd., 513 F.2d 1176, 1182 (6th Cir. 1975); Burchett v. Bardahl Oil Co., 470 F.2d 793, 796-97 (10th Cir. 1972); Davis v. Asano Bussan Co., 212 F.2d 558, 563-64 (5th Cir. 1954), or another corporation may act as an agent for a corporate principal so as to subject it to long-arm jurisdiction. There appears to be no reason why a completely independent, in-state corporation cannot be held to have acted as an agent for another, out-of-state corporation in performing activities giving rise to a cause of action, see, e. g., Great American Ins. Co. v. Katani Shipping Co., 429 F.2d 612, 614 (9th Cir. 1970); Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 332 F.2d 135, 138-41 (5th Cir.), cert. denied, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185 (1964); Young v. Albert Pick Hotels, 115 U.S.App.D.C. 400, 320 F.2d 719 (1963); Orient Mid-East Lines, Inc. v. Albert E. Bowen, Inc., 297 F.Supp. 1149, 1152 (S.D.N.Y.1969), aff'd, 458 F.2d 572 (2d Cir. 1972), and establishment of the requisite " agency" control may be even easier when a parent-subsidiary relationship is involved, see, e.g., Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 492 (5th Cir. 1974); In-Flight Devices Corp. v. Van Dusen Air, Inc., 466 F.2d 220, 235 n.16 (6th Cir. 1972); Engine Specialties, Inc. v. Bombardier, Ltd., 454 F.2d 527, 529-30 (1st Cir. 1972); Call Carl, Inc. v. B.P. Oil Corp., 391 F.Supp. 367, 371-75 (D.Md.1975); Miller v. Trans World Airlines, Inc., 302 F.Supp. 174, 177-78 (E.D.Ky.1969). See generally 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1069, at 255-57 (1976). While the mere existence of a parent-subsidiary relationship has been held in itself to constitute insufficient evidence of control so as to subject the parent to service for the acts of the subsidiary under the agency rationale, see, e. g., Peterson v. U-Haul Co., 409 F.2d 1174, 1184-85 (8th Cir. 1969); Velandra v. Regie Nationale des Usines Renault, 336 F.2d 292, 296-97 (6th Cir. 1964); Steinway v. Majestic Amusement Co., 179 F.2d 681, 683-84 (10th Cir. 1949), if a common law agency is found to exist, the parent may properly be served, see, e. g., Milligan v. Anderson, 522 F.2d 1202, 1205-07 (10th Cir. 1975). See Marsh v. Kitchen, 480 F.2d 1270, 1272-73 (2d Cir. 1973). See also Leach Co. v. Sani-Can Mfg. Corp., 393 F.2d 183, 185-86 (7th Cir. 1968).[13]
 
 4. A.G. as the Shareholder of Express
 
 53
 Finally, plaintiffs appear to argue that, although A.G.'s acquisition and ownership of the stock of Express would probably not alone be sufficient to establish A.G.'s "presence" in Nevada, those activities do in themselves qualify as the transaction of business or the commission of a tort under the Nevada long-arm statute. Although it is unclear from plaintiffs' incomplete argument, they may be advancing one or both of the following theories: First, plaintiffs may be arguing that the very acts of acquiring and owning a corporation which is incorporated and operates in Nevada under an infringing name are sufficient to give rise to trademark infringement and unfair competition causes of action against A.G. in Nevada. If valid causes of action do indeed arise from such activity "in" Nevada issues which we do not here decide, Nevada's long-arm statute would seem to be strong enough to reach A.G.[14]
 
 
 54
 Second, given plaintiffs' repeated emphasis on Express' "undercapitalized" condition, it seems that they are concerned that any recovery against Express for its own wrongful activities will go unsatisfied. They argue that Express is a mere shell with figurehead officers, and that the shareholders of Express should be held liable on an "alter ego" theory for any liability that Express itself incurs.[15]
 
 
 55
 Under this theory, A.G. would be subject to service under the Nevada long-arm statute not for the infringing and unfair acts of Express as it would be according to the agency rationale discussed in Part I.A.3. supra, but rather for any unmet judgment liability of Express resulting from plaintiffs' suit based on those acts. A.G.'s stock ownership could once the "corporate veil" raised by Express is "pierced" thus be said to "give rise" to its alter ego liability as the shareholder of Express. Cf. Threlkeld v. Tucker, 496 F.2d 1101, 1104 (9th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974). In other words, under this theory the cause of action which would "arise from" A.G.'s activity "in" Nevada would not be one for trademark infringement or unfair competition, but rather one for loosing on the world an undercapitalized corporation which is incorporated and doing business in Nevada but unable to meet its obligations incurred there.[16] It is A.G.'s alter ego liability which could be characterized as a cause of action arising either from the transaction of business or the commission of a tort in Nevada for purposes of that state's long-arm statute.
 
 
 56
 Although plaintiffs have been unable to find authority which recognizes this latter theory because most "alter ego" cases in the jurisdictional context ultimately impute the acts of the corporation to the shareholders under an agency rationale, there may indeed be something to commend it. A foreign shareholder should not be permitted to own a shell American corporation that engages in wrongful conduct for which the foreign shareholder may potentially be held liable on an alter ego theory, but for which he cannot be reached because he claims that the corporation did not act as his agent to further his business affairs. Common sense dictates that it would be neither unreasonable nor unfair to reach the shareholder in those circumstances, for he has presumably entered into the ownership and control of the offending corporation intentionally.
 
 
 57
 Given the facts as currently established, however, A.G. would not be the shareholder reached by a piercing of the corporate veil raised by Express. It is Jacobs who is now the professed owner of all of Express' shares, and it may be anticipated that he will continue to be the owner until the time when alter ego liability is sufficiently established. Plaintiffs do, however, challenge the stock sale to Jacobs as a sham because it occurred after Express was served in the instant suit albeit before A.G. was named as a defendant and involved a consideration of only $100.[17] In any event, the contention that the sale to Jacobs was a sham need not be reached in this case unless if and when the corporate form of Express is in fact ignored and its shareholders reached Jacobs is found to be unable to bear Express' liabilities.
 
 
 58
 It goes without saying that the district court considered neither of the theories presented under our reading of the plaintiffs' stock ownership argument. A remand is necessary to enable it to do so.
 
 
 59
 B. A.G.'s Amenability to Process for its Foreign Activities
 
 
 60
 Plaintiffs are not satisfied with the substantial but limited possibilities for securing personal jurisdiction over A.G. under Nevada's long-arm statute. They seek to reach A.G. not only for the wrongs which may have arisen from its "minimum contacts" with the state, but also for all injuries allegedly sustained by them through the activities of A.G. no matter where conducted. In other words, plaintiffs want to sue A.G. in the federal district court of Nevada for the alleged instances of trademark infringement and unfair competition committed by A.G. abroad and in American states other than Nevada.[18] To do so, they must demonstrate as they have succeeded in doing for Express that A.G. is "doing business" and is, therefore, "present" in Nevada so as to be subject to that state's general jurisdiction.
 
 
 61
 Plaintiffs allege that A.G. has certain Nevada contacts which, although they may not in themselves provide a basis for service because they may be unrelated to plaintiffs' causes of action, see, e. g., Fulghum Indus., Inc. v. Walterboro Forest Prods., Inc., 477 F.2d 910, 912 (5th Cir. 1973); Wilshire Oil Co. v. Riffe, 409 F.2d 1277, 1281-82 (10th Cir. 1969), may be given some weight in determining whether A.G. is present there. Recognizing, however, that these contacts even when taken together with the one Nevada loan are probably insufficient to meet the exacting test for "presence," they have advanced yet another theory: that A.G.'s own "presence" in Nevada may be established through Express' acknowledged "presence" there. This theory may be read in two ways.
 
 
 62
 1. Express as the "General Agent" of A.G.
 
 
 63
 First, plaintiffs' contentions may be interpreted as suggesting that Express, even though it may have been an independently-managed corporation, was acting in Nevada as the "general agent" of A.G. Their previous "agency" theory was aimed at establishing that Express was A.G.'s agent for the special purpose of transacting that business in Nevada or committing the torts there so that those activities would be imputed to A.G., thus opening A.G. to long-arm service for actions arising from those activities. Plaintiffs' "general agency" argument is somewhat different. It apparently is an attempt to show that Express was the "general agent" of A.G. so that Express' "presence" in Nevada may, so to speak, be imputed to A.G., thus opening A.G. to service under Fed.R.Civ.P. 4(d)(3) & (4)(f) and to the general jurisdiction of the Nevada district court for suits on all of A.G.'s activities wherever conducted. Under the former "agency" theory, plaintiffs need to show only a special agency for the purpose, and at the time, of the complained of acts of Express. Under the latter theory, however, a "general agency" must be shown at the time suit was filed against Express, thus demonstrating that A.G. itself was present and personally served in Nevada at that time so that it is not unfair or unreasonable to have A.G. answer to the general jurisdiction of the Nevada district court.
 
 
 64
 By providing for personal service on the in-state "general agent" of a "domestic or foreign corporation," Fed.R.Civ.P. 4(d)(3) & (4)(f) clearly evince a legislative authorization to serve a foreign corporation by serving its in-state "general agent." The common law requirements of a "general agency" demand that such substantial activities be carried on for the benefit of the principal that, in some cases, those same activities may indeed be sufficient to render the principal himself "present" under the "continuous and systematic" test of Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445-46, 72 S.Ct. 413, 96 L.Ed. 485 (1952). See Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 668-69 (2d Cir. 1965); Lone Star Package Car Co. v. Baltimore & O.R. Co., 212 F.2d 147, 152 (5th Cir. 1954); Bomze v. Nardis Sportswear, 165 F.2d 33, 37 (2d Cir. 1948); Stanley Works v. Globemaster, Inc., 400 F. Supp. 1325, 1330-36 (D.Mass.1975); PPS, Inc. v. Jewelry Sales Representatives, Inc., 392 F.Supp. 375, 378-79 (S.D.N.Y.1975); Lehn & Fink Prods. Corp. v. Milner Prods. Co., 117 F.Supp. 320, 322 (S.D.N.Y.1953); 4 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1104, at 404 (1976) (noting congruence of "general agency" case law on Rule 4(d)(3) manner of service and issue of amenability to service).
 
 
 65
 In Gottlieb v. Sandia American Corp., 452 F.2d 510 (3d Cir.), cert. denied sub nom. Wechsler v. Gottlieb, 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971), the Third Circuit defined a "general agent" for purposes of Rule 4(d)(3) as follows:
 
 
 66
 One occuping (sic ) this position typically will perform duties which are "sufficiently necessary" to the corporation's operations. He should be "a responsible party in charge of any substantial phase" of the corporation's activity. In brief, it is reasonable to expect that such an agent will have broad executive responsibilities and that his relationship will reflect a degree of continuity. Authority to act as agent sporadically or in a single transaction ordinarily does not satisfy this provision of the Rule.
 
 
 67
 452 F.2d at 513 (citations omitted). A similar test for jurisdiction was set out by the Second Circuit in Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116, 121 (2d Cir. 1967):
 
 
 68
 (A) foreign corporation is doing business in New York "in the traditional sense" when its New York representative provides services beyond "mere solicitation" and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.
 
 
 69
 Accord, Sunrise Toyota, Ltd. v. Toyota Motor Co., 55 F.R.D. 519, 528-29 (S.D.N.Y.1972); Tokyo Boeki (U.S.A.), Inc. v. S S Navarino, 324 F.Supp. 361, 365-67 (S.D.N.Y.1971); Spectacular Promotions, Inc. v. Radio Station WING, 272 F.Supp. 734, 736 (E.D.N.Y.1967). See Freeman v. Gordon & Breach, Science Publishers, Inc., 398 F.Supp. 519, 520-23 (S.D.N.Y.1975).
 
 
 70
 Although it has not always been designated as such in the cases, there is much authority for such a "general agency" theory of "presence," and it is clear that whether the alleged general agent was a subsidiary of the principal or independently owned is irrelevant. See, e. g., Scanapico v. Richmond, Fredericksburg & Potomac R. Co., 439 F.2d 17, 25-28 (2d Cir. 1970) (en banc); Beautytuft, Inc. v. Factory Ins. Ass'n, 431 F.2d 1122, 1125-26 (6th Cir. 1970); Grantham v. Challenge-Cook Bros., Inc., 420 F.2d 1182, 1186 (7th Cir. 1969); Mooney Aircraft, Inc. v. Donnelly, 402 F.2d 400, 403-05 (5th Cir. 1968); Diapulse Corp. v. Birtcher Corp., 362 F.2d 736, 739-41 (2d Cir.), cert. dismissed, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 (1966); Curtis Publishing Co. v. Cassel, 302 F.2d 132, 137-38 (10th Cir. 1962); Scholnik v. National Airlines, Inc., 219 F.2d 115 (6th Cir.), cert. denied, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955); Fisher v. First National Bank, 338 F.Supp. 525, 529-30 (S.D.Iowa), appeal dismissed, 466 F.2d 511 (8th Cir. 1972); Farkas v. Texas Instruments, Inc., 50 F.R.D. 484, 487 (D.Mass.1969), aff'd, 429 F.2d 849 (1st Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 324 (1971); Scalise v. Beech Aircraft Corp., 276 F.Supp. 58, 62-65 (E.D.Pa.1967); Szantay v. Beech Aircraft Corp., 237 F.Supp. 393 (E.D.S.C.), aff'd, 349 F.2d 60, 62 (4th Cir. 1965); Atlantic Enterprises, Inc. v. National Equip. Rental, Ltd., 208 F.Supp. 710, 711 (D.P.R.1962); Nugey v. Paul-Lewis Laboratories, Inc., 132 F.Supp. 448 (S.D.N.Y.1955); Thomson v. Eastern Bechtel Corp., 24 F.R.D. 41, 43 (S.D.N.Y.1959). See also Orefice v. Laurelview Convalescent Center, Inc., 66 F.R.D. 136, 141 (E.D.Pa.1975) (parent as agent of subsidiary). See generally 2 J. Moore, Moore's Federal Practice P 4.22(2), at 1123-30 (2d ed. 1976); 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1104, at 398-404 (1976).
 
 
 71
 Given the legislative authorization, and if plaintiffs can establish that A.G. was carrying on "continuous and systematic" activities in Nevada through Express acting as A.G.'s "general agent,"[19] we see no reason why A.G. itself should not be said to have been present there and served at the time Express was served.[20]2. Express as a "Division" of A.G.
 
 
 72
 Second, plaintiffs maintain that Express is in fact not an independent corporation but a mere veil for its owner, A.G.; that that veil should be pierced; that Express should be viewed as a part of the resulting single corporate entity; and that, since Express is clearly "doing business" within Nevada, A.G. itself is present within the state and may, therefore, be reached under Rules 4(d)(3) & 4(f). They seem to argue that, if Express were not separately incorporated but a mere "division" or "branch" of A.G., A.G. itself would be held to be "present" in Nevada if the activities of the "Express division" there were sufficiently "continuous and systematic" to meet the due process test. They thus hope to sue A.G. in Nevada for the non-Nevada activities carried on by all parts of A.G. including Express.
 
 
 73
 Clearly, a corporation may be "present" in several jurisdictions by operating "divisions" there so that it may not, in some instances, be unreasonable or unfair to subject to the corporation to the general jurisdiction of any one of these forums regardless of where the cause of action arose or which of the corporation's division's activities gave rise to it. See, e. g., Rebozo v. Washington Post Co., 515 F.2d 1208 (5th Cir. 1975); Eck v. United Arab Airlines, Inc., 360 F.2d 804, 810-11 (2d Cir. 1966). It may also be just and equitable in some cases to treat two separately incorporated entities as one where the corporate vehicle is employed as a device by which to conduct "continuous and systematic" activities in a state without subjecting the out-of-state corporation to the general jurisdiction of the forum. Several courts have acknowledged the validity of this "alter ego" theory as a means by which to reach the out-of-state parent, see, e. g., Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437, 440-41 (1st Cir.), cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 667-68 (2d Cir. 1965); Idaho Potato Comm'n v. Washington Potato Comm'n, 410 F.Supp. 171, 179-80 (D.Idaho 1975); Call Carl, Inc. v. B P Oil Corp., 391 F.Supp. 367, 371-75 (D.Md.1975); Sunrise Toyota, Ltd. v. Toyota Motor Co., 55 F.R.D. 519, 528 (S.D.N.Y.1972); Farkas v. Texas Instruments, Inc., 50 F.R.D. 484, 487 (D.Mass.1969), aff'd, 429 F.2d 849 (1st Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 324 (1971), or subsidiary, see, e. g., Blount v. Peerless Chems. (P.R.), Inc., 316 F.2d 695 (2d Cir.), cert. denied sub nom. Colbert v. Peerless Chems. (P.R.), Inc., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); Orefice v. Laurelview Convalescent Center, Inc., 66 F.R.D. 136, 140-41 (E.D.Pa.1975); Baird v. Day & Zimmerman, Inc., 390 F.Supp. 883 (S.D.N.Y.1974), aff'd, 510 F.2d 968 (2d Cir. 1975); Goldrick v. D. M. Picton Co., 56 F.R.D. 639 (E.D.Vir.1971); Associated Metals & Minerals Corp. v. S S Rialto, 280 F.Supp. 207 (S.D.N.Y.1967). See also O. S. C. Corp. v. Toshiba America, Inc., 491 F.2d 1064, 1067-68 (9th Cir. 1974); Lee v. Walworth Valve Co., 482 F.2d 297, 301 (4th Cir. 1973). See generally 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1069, at 255-57 (1976); id. § 1104, at 400-04.
 
 
 74
 Here, factors different from those which were relevant to deciding whether Express was the otherwise independent "general agent" of A.G. may be at issue. Some courts have stressed the "undercapitalized" condition of a subsidiary in this context, as do plaintiffs here. But it appears that this criterion, which is important to deciding whether to pierce the veil raised by a subsidiary corporation in order to hold the parent corporation liable for failure of the subsidiary to meet its debts, may not be relevant to a showing that the two corporations are in fact one so as to establish that the out-of-state corporation be it parent or subsidiary is present within the forum for jurisdictional purposes. See McPheron v. Penn Central Transp. Co., 390 F.Supp. 943, 952-53 (D.Conn.1975). Rather, the operative question is whether the two corporations are in fact mere "divisions" or "branches" of a larger whole. Nevertheless, except for the factor of "undercapitalization," it does appear that the same factors which would demonstrate an "alter ego" relationship between a corporation and its shareholders for purposes of holding the shareholders liable for the unmet obligations of the corporation are for the most part relevant in the jurisdictional context as well. See Lakota Girl Scout C., Inc. v. Havey Fund-Rais. Man., Inc., 519 F.2d 634, 637-38 (8th Cir. 1975); Engine Specialties, Inc. v. Bombardier, Ltd., 454 F.2d 527, 529-30 (1st Cir. 1972); Volkswagen Interamericana, supra at 439-40; Blount, supra at 698-99; ACS Industries, Inc. v. Keller Industries, Inc., 296 F.Supp. 1160, 1163-64 (D.Conn.1969); Scalise v. Beech Aircraft Corp., 276 F.Supp. 58, 62 (E.D.Pa.1967). See generally NLRB v. Deena Artware, Inc., 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960); Markow v. Alcock, 356 F.2d 194, 197-98 (5th Cir. 1966). Professor Moore summarizes the "alter ego" factors in the jurisdictional context as follows:
 
 
 75
 whether the officers and directors of the two are the same; whether the subsidiary pays cash for products sold or service rendered to it by the parent; whether separate books, bank accounts, tax returns, financial statements and the like are kept; and whether the parent corporation holds the subsidiary out as an agent, either expressly or impliedly as by representing it is doing business in, or has an office in the state, when only the subsidiary is present.
 
 
 76
 2 J. Moore, Moore's Federal Practice P 4.25(6), at 1175-76 (2d ed. 1976) (footnotes omitted) (looking to "alter ego" factors both to "pierce the corporate veil" to reach the parent corporation and to establish an "agency" relationship).[21]
 
 
 77
 C. Conclusion as to In Personam Jurisdiction over A.G.
 
 
 78
 The court below considered none of these "minimum contacts" or "presence" theories as possible bases on which to hold A.G. subject to its in personam jurisdiction. The court's holding that the mere stock ownership by A.G. of Express was insufficient to confer personal jurisdiction over A.G. may have been correct in itself, but it does not begin to address the complex though apparently well-recognized theories outlined by us.
 
 
 79
 While we have attempted carefully to organize the various legal theories which may be derived from plaintiffs' arguments and the case law in this area, it must be cautioned that questions of personal jurisdiction admit of no simple solutions and that ultimately due process issues of reasonableness and fairness must be decided on a case-by-case basis. Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952); Amba Marketing Systems, Inc. v. Jobar Int'l, Inc., 551 F.2d 784, 789 (9th Cir. 1977); Wright v. Yackley, 459 F.2d 287, 290-91 & n. 7 (9th Cir. 1972); Gardner Eng'r. Corp. v. Page Eng'r. Co., 484 F.2d 27, 30-31 (8th Cir. 1973); Benjamin v. Western Boat Building Corp., 472 F.2d 723, 725 (5th Cir.), cert. denied, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973). Since it is for the district court in the first instance to evaluate these theories in light of facts which plaintiffs may be able to develop, we vacate the dismissal of A.G. for lack of personal jurisdiction and remand for further proceedings.
 
 
 80
 II. SUBJECT MATTER JURISDICTION OVER A.G.'s ACTIVITIES
 
 
 81
 The Lanham Act grants a registrant a civil right of action against "(a)ny person who shall . . . use in commerce," in any improper manner detailed therein, a registered trademark. 15 U.S.C. § 1114(a)(1). For purposes of the Act, "commerce" is sweepingly defined as "all commerce which may lawfully be regulated by Congress." Id. § 1127. Section 1121 provides the federal courts with subject matter jurisdiction over causes of action arising under the Act.
 
 
 82
 As the district court below correctly noted, see 358 F.Supp. at 1079-81, the jurisdictional requirement that infringement occur "in commerce" has been read not necessarily to require that the infringing acts have taken place "in commerce" which is subject to congressional regulation, but that the acts have an adverse effect on that commerce. Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir.), cert. denied,391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); Franchised Stores of New York, Inc. v. Winter, 394 F.2d 664, 669-70 (2d Cir. 1968). See 15 U.S.C. § 1127 (intent of Congress). In the context of those cases, the courts held that purely intrastate infringing activities which had a substantial adverse impact on the reputation and good will of a registrant whose products were sold in interstate commerce were actionable.
 
 
 83
 In the instant case, the district court held that, because the business of both plaintiffs was interstate in character, even the purely intrastate activities of Express could be reached if those activities had the requisite substantial, adverse effect on plaintiffs' interstate business. A fortiori, the court ruled, Express' interstate activities were covered. 358 F.Supp. at 1081. The court held that A.G.'s foreign activities, however, could not be reached under the Lanham Act. See 358 F.Supp. at 1074-77. Finally, as we noted in our discussion of in personam jurisdiction, the district court did not deal in its opinion with the domestic activities of A.G. Plaintiffs appeal the latter two issues.
 
 A. A.G.'s Foreign Activities
 
 84
 The district court ruled that the Lanham Act was generally limited to causes of action arising out of American activities. It held that foreign activities could be reached only if the following three factors were present:
 
 
 85
 (1) Defendant's conduct must have had a substantial effect on United States commerce; (2) defendant must be a United States citizen, as the United States has broad powers to regulate the conduct of its citizens in foreign countries; (3) there must be no conflict with trademark rights established under the foreign law.
 
 
 86
 358 F.Supp. at 1077. Although it is somewhat unclear, it appears that the district court's test required that all of the factors be present. This conclusion follows from the court's holding that, even if A.G. and Express be viewed as one corporation, the court would decline jurisdiction because A.G.'s "purely foreign activities have no substantial effect on commerce in the United States and there would exist a conflict between the trademark laws of the United States and the trademark laws of foreign countries." Id.
 
 
 87
 In so holding, the district court carefully analyzed the three cases which have discussed whether foreign activities may be reached under the Lanham Act. Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952); Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Ramirez & Feraud Chili Co. v. Las Palmas Food Co., Inc., 146 F.Supp. 594 (S.D.Cal.1956), aff'd per curiam, 245 F.2d 874 (9th Cir. 1957), cert. denied, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958). It did not, however, have before it this court's recent decision in Timberlane Lbr. Co. v. Bank of America, N. T. & S. A., 549 F.2d 597 (9th Cir. 1976). In Timberlane, we set down a "jurisdictional rule of reason" to govern the extraterritorial reach of the Sherman Act which, like the Lanham Act, contains sweeping jurisdictional language. Compare 15 U.S.C. §§ 1 & 2 with 15 U.S.C. §§ 1114(a)(1) & 1127.
 
 
 88
 Our review of the cases on which the district court relied,[22] and the extensive analysis of extraterritoriality undertaken by us in Timberlane, see 549 F.2d at 608-15, lead us to the conclusion that the district court's denial of subject matter jurisdiction under the Lanham Act must be vacated. First, it seems clear that, just as in the interstate context, the extraterritorial coverage of the Lanham Act should be gauged not so much by the locus of the activity sought to be reached as the district court below held, see 358 F.Supp. at 1076 as by the nature of its effect on that commerce which Congress may regulate. See Bulova, 344 U.S. at 286, 73 S.Ct. 252.
 
 
 89
 Next, although foreign activities must of course have some effect on United States foreign commerce before they can be reached, we disagree with the district court's requirement that that effect must be "substantial." Bulova contains no such requirement. And, as we noted in Timberlane, since the origins of the "substantiality" test apparently lie in the effort to distinguish between intrastate commerce, which Congress may not regulate as such, and interstate commerce, which it can control, it may be unwise blindly to apply the factor in the area of foreign commerce over which Congress has exclusive authority. See Timberlane, 549 F.2d at 612.
 
 
 90
 Finally, while we agree with the district court that each of the three factors which it cited degree of effect on United States commerce, the citizenship of defendants, and the existence of a conflict with foreign trademark registrations are indeed relevant to the resolution of the jurisdictional issue, contrary to the apparent view of the district court, the absence of one of the factors is not necessarily determinative of the issue. Rather, each factor is just one consideration to be balanced in the "jurisdictional rule of reason" of comity and fairness adopted by us in Timberlane:
 
 
 91
 The elements to be weighed include the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad. A court evaluating these factors should identify the potential degree of conflict if American authority is asserted. A difference in law or policy is one likely sore spot, though one which may not always be present. Nationality is another; though foreign governments may have some concern for the treatment of American citizens and businesses residing there, they primarily care about their own nationals. Having assessed the conflict, the court should then determine whether, in the face of it, the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.
 
 
 92
 549 F.2d at 614-15 (footnotes omitted).
 
 
 93
 In the instant case, it appears that plaintiffs have been successful in securing the invalidation of some, but not all, foreign registrations held by A.G. and its European subsidiaries.[23] While A.G. and its affiliates are alien corporations, they may indeed be conducting some commercial activity in the United States either themselves or through the Express entity. Moreover, A.G.'s activities may have some effect on both plaintiffs' domestic business and Wells Fargo Bank's heavily-advertised international affairs, and plaintiffs do maintain that A.G.'s scheme has all along been purposeful and deliberate.
 
 
 94
 We are, however, not prepared to say that some or all of A.G.'s foreign activities may be reached under the Lanham Act. Therefore, we vacate the dismissal of the district court and remand the issue to it for the opportunity to apply the Timberlane test to the jurisdictional facts which plaintiffs can establish.
 
 B. A.G.'s Domestic Activities
 
 95
 Plaintiffs suggest that, while A.G.'s foreign activities may indeed test the extraterritorial reach of the Lanham Act, A.G.'s American infringing activities including its one Nevada loan, its two California loans, and whatever actions of Express may be imputable to it should be analyzed as would any case involving purely interstate activities. We note, however, that, when faced with both Mexican and United States activities of an American citizen that were part of one infringing scheme, this court adopted an analysis which at least in part was premised on the need to deal with the extraterritorial nature of defendant's activities. See Ramirez & Feraud Chili Co. v. Las Palmas Food Co., Inc., 245 F.2d 874 (9th Cir. 1957), aff'g per curiam and adopting by reference, 146 F.Supp. 594, 600-02 (S.D.Cal.1956).
 
 
 96
 In the instant case, the funds loaned by A.G. in America presumably came from abroad into the United States, much the same as did the chili cans in Ramirez. Loan negotiations took place here, and in Ramirez the printing of the counterfeit labels was done in the United States. However, unlike the principal defendant in Ramirez, A.G. is an alien. On the other hand, if Express' activities are imputed to A.G., those actions all took place within the United States and involved an American agent, Express.
 
 
 97
 We find it unnecessary to offer an extended discussion of the conceptual problem posed here by plaintiffs. Whether A.G.'s alleged American activities are to be tested separately from the foreign activities or together under the Timberlane standard, we hold that the American portion is clearly covered. That such interstate commerce is carried on by an alien may present service of process problems, but we fail to see how the fundamental "territorial" reach of the Lanham Act noted both in Ramirez, 146 F.Supp. at 600, and by the court below, 358 F.Supp. at 1075-77, is weakened by the fact that additional activities took place abroad or that a defendant is an alien. See, e. g., Vanity Fair, 234 F.2d at 647-48 & n. 21; Menendez v. Faber, Coe & Gregg, Inc., 345 F.Supp. 527, 557-58 (S.D.N.Y.1972), modified on other grounds sub nom. Menendez v. Saks & Co., 485 F.2d 1355, 1374-77 (2d Cir. 1973), rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).
 
 
 98
 If anything, judging A.G.'s American activities as part of its overall infringing scheme under the test of Timberlane which was fashioned in the context of activities that were primarily foreign and were carried out by defendants of both American and foreign nationalities, see 549 F.2d at 615 might make it easier for plaintiffs to attack the entire scheme of A.G. than if the domestic and foreign activities of A.G. are viewed separately. In any event, of course, A.G.'s domestic activities are clearly reachable, and the district court on remand should explore possible violations of the Lanham Act
 
 
 99
 arising therefrom. C. Conclusion as to Subject Matter
 
 Jurisdiction over A.G.'s Activities
 
 100
 Since the court below did not have before it our recent decision in Timberlane when it ruled on the extraterritorial reach of the Lanham Act and does not appear to have considered possible Lanham Act violations growing out of A.G.'s domestic activities, we vacate the district court's ruling and remand both issues for consideration in light of our opinion and those jurisdictional facts which plaintiffs may be able to develop.[24]III. FORUM NON CONVENIENS
 
 
 101
 Finally, the district court did recognize that subject matter jurisdiction over an unfair competition suit based on A.G.'s foreign activities could be bottomed on diversity. It nevertheless dismissed such a suit. The court held that it did not have in personam jurisdiction over A.G. and that, even if it could reach A.G., it would dismiss a diversity suit because, under conflict of law principles, the law of the place of the "passing off" would govern, Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir.), cert. denied, 352 U.S. 913, 77 S.Ct. 144, 1 L.Ed.2d 120 (1956), and the inconvenience of applying foreign law outweighed any advantage to plaintiffs in being able to bring suit in Nevada. See 358 F.Supp. at 1078. Once again, the court did not consider A.G.'s domestic activities.
 
 
 102
 Since we have held that the court may be able to reach A.G. for both its foreign and domestic activities and that subject matter jurisdiction and a cause of action may be possible for even A.G.'s foreign activities under the Lanham Act, we vacate the district court's forum non conveniens dismissal. In doing so, however, we note that considerations integral to both the due process test for in personam jurisdiction and our own Timberlane "jurisdictional rule of reason" are also relevant to a ruling on the forum non conveniens issue, and that a close finding of jurisdiction in either sense still does not foreclose the district court from deciding anew on remand that, in its discretion, Nevada is not a convenient forum in which to litigate part or all of the possible actions against A.G. See generally Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Amba Marketing Systems, Inc. v. Jobar Int'l, Inc., 551 F.2d 784, 789-90 (9th Cir. 1977); Timberlane Lbr. Co. v. Bank of America, N.T. & S.A., 549 F.2d 597, 616 (9th Cir. 1976); Olympic Corp. v. Societe Generale, 462 F.2d 376, 378-79 (2d Cir. 1972).
 
 
 103
 VACATED AND REMANDED.
 
 
 
 *
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 At this stage of the proceedings, we of course accept plaintiffs' allegations as true. Steele v. Bulova Watch Co., 344 U.S. 280, 284, 73 S.Ct. 252, 97 L.Ed. 252 (1952); Des Brisay v. Goldfield Corp., 549 F.2d 133, 135 n.3 (9th Cir. 1977)
 
 
 [2]
 Among the alleged European subsidiaries of A.G. are the following: Wells Fargo Express, Ltd. is an Irish corporation organized in 1967. This wholly-owned subsidiary of A.G. owns an interest in a printing company and has a banking charter as well. Wells Fargo Express, S.A., a Spanish company, was also organized in 1967. It is a partially-owned subsidiary of A.G. and engages in the shoe and furniture manufacturing business, operates a Madrid boutique, and is part owner of La Manga Compania de Golf. Finally, there is Wells Fargo of Gibraltar. Organized in 1968, this corporation was apparently associated with a gambling casino which Heymann owned in Gibraltar
 
 
 [3]
 According to plaintiffs, Jacobs, when deposed, refused to state whether he held the stock as a nominee for another or whether $100 was the sole consideration. Before this sale, ownership of both the stock of Express and its assets had been shuffled around through various other subsidiaries of A.G., but A.G. apparently remained the ultimate parent, at least until the sale to Jacobs. See 358 F.Supp. at 1072-73
 
 
 [4]
 A.G. neither submitted a brief nor appeared for oral argument before us. Its counsel did, however, file a status report on foreign litigation to supplement a similar report filed by plaintiffs in response to our request at argument. See note 23 infra
 
 
 [5]
 Although the court did not make its basis for exercising in personam jurisdiction over Express explicit, we are assuming that Express' clear "presence" within Nevada obviated the need to make use of the state's long-arm statute. This theory also explains why the court had personal jurisdiction over Express for Express' out-of-state as well as Nevada activities. See 358 F.Supp. 1081, 1083
 
 
 [6]
 Following the clear weight of authority, we thus answer the question regarded as open in Aanestad v. Beech Aircraft Corp., 521 F.2d 1298, 1301 n.1 (9th Cir.), cert. denied, 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974). See also Republic Internat'l Corp. v. Amco Engineers, Inc., 516 F.2d 161, 167 (9th Cir. 1975) (dictum approving modern due process "presence" test); Mechanical Contractors Ass'n v. Mechanical Con. A. of N. Cal., 342 F.2d 393, 398 (9th Cir. 1965) (same)
 
 
 [7]
 Alien defendants are, of course, entitled to due process. See Galvan v. Press, 347 U.S. 522, 530, 74 S.Ct. 737, 98 L.Ed. 911 (1954). Courts sometimes note that, where an alien defendant is involved, see, e. g., Alco Standard Corp. v. Benalal, 345 F.Supp. 14, 24-25 (E.D.Pa.1972); SEC v. Myers, 285 F.Supp. 743, 748-49 (D.Md.1968), and possibly in all cases in which a federal question is at issue, see, e. g., Honeywell, Inc. v. Metz Apparatewerke, 509 F.2d 1137, 1143 (7th Cir. 1975); Time, Inc. v. Manning, 366 F.2d 690, 693-95 (5th Cir. 1966); Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 548-49 (4th Cir. 1965); Edward J. Moriarity & Co. v. General Tire & Rubber Co., 289 F.Supp. 381, 390 (S.D.Ohio 1967), the due process clause of the fifth amendment rather than that of the fourteenth should be the focus of analysis. See Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 440 n.3 (1st Cir. 1966). Since, however, no case seems to have interpreted these two provisions differently in the context of amenability to process, we need not comment on the distinction other than to note that, in any event, International Shoe and its progeny point the way
 
 
 [8]
 Nationwide contacts were highlighted in the opinion because, while all of defendants' world-wide activities caused plaintiffs' Utah injuries, the court held that federal patent legislation gives a cause of action in "tort" only for United States, not foreign, activities. See 362 F.Supp. at 727. Finally, under the circumstances before it, the court found jurisdiction under the Utah long-arm statute to be constitutional, and the court's expansive language comes in the context of the due process analysis rather than that of the statutory grant. Id. at 728
 
 
 [9]
 Yet another case relied on by the Cryomedics court may not properly be read to support it. In Holt v. Klosters Rederi A/S, 355 F.Supp. 354 (W.D.Mich.1973), the court recognized that statutory as well as due process requirements must be met before personal jurisdiction could be asserted, but then apparently took the highly suspect position that, since the alien defendants in their challenge to the court's in personam jurisdiction had spoken only of its "power" to render a judgment over them, they had "waived" their right to challenge the statutory basis for the court's in personam jurisdiction. See 355 F.Supp. at 357-58. The court then proceeded to analyze defendants' nationwide contacts only to see if constitutional "minimum contacts" existed with this country. We question such a restrictive view of Fed.R.Civ.P. 12(b), (g), & (h)
 
 
 [10]
 The Seventh Circuit in Honeywell appears to be the only other circuit court to have been confronted with the aggregation theory. That court expressly declined to pass on it. See 509 F.2d at 1143 n.2
 
 
 [11]
 Our consideration here is limited to Express' in-state activities. Once again, even if Express' out-of-state acts were to be imputed to A.G., that would not be a basis for reaching A.G. from Nevada under that state's long-arm statute. See Part I.A.2. supra. Express itself may be sued in Nevada even for out-of-state activities because it is "present" in Nevada. See note 5 supra. In order to sue A.G. in Nevada on the non-Nevada activities of Express that are imputable to it on an agency theory, plaintiffs would have to show not that Express is present in Nevada, but that A.G. itself is present there. Plaintiffs do attempt to demonstrate that fact. See I.B. infra. But that is a separate matter
 
 
 [12]
 See page 414 supra for the complete text of Nev.Rev.Stat. § 14.065(2)
 Plaintiffs apparently do not claim that either the Federal Rules or the Nevada long-arm statute permits service on a corporate parent in any case arising out of the in-state acts of the subsidiary. While such a statutory rule might, if enacted, be constitutional, see Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 332 F.2d 135, 138 & n.9 (5th Cir.), cert denied, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185 (1964); Berkman v. Ann Lewis Shops, Inc., 142 F.Supp. 417, 422 (S.D.N.Y.1956), aff'd, 246 F.2d 44 (2d Cir. 1957), it is clear that neither the Federal Rules nor Nevada has such a provision. Under Nev.Rev.Stat. § 14.065, plaintiffs must establish that Express was in fact acting as A.G.'s "agent" or "instrumentality" in performing the allegedly wrongful acts in Nevada.
 
 
 [13]
 While most of the cases in this area talk also in terms of "piercing the corporate veil" when a parent and subsidiary are involved, the existence of an intercorporate agency is as highlighted by those cases involving corporations without common ownership an independently sufficient basis for long-arm jurisdiction. See 2 J. Moore, Moore's Federal Practice P 4.25(6), at 1174-76 (2d ed. 1976). This is not to say, however, that the "alter ego" theory itself may not be an additional ground for service. But if the veil between the subsidiary and parent is pierced so that each is found to be a "branch" or "division" of a larger whole, not only would the acts of the part be imputed to the whole, as in any case of agency, but also the in-state "presence" of one part may render the out-of-state part present in the forum as well. For this reason, the discussion of whether Express and A.G. are separate corporations is reserved until the analysis of plaintiffs' "presence" theories. See Part I.B.2. infra
 
 
 [14]
 Even if ownership of a subsidiary corporation does constitute the transaction of business within the state for purposes of the state long-arm statute, the cause of action has to "arise from" that stock ownership. But compare Wilshire Oil Co. v. Riffe, 409 F.2d 1277, 1281-82 & n.11 (10th Cir. 1969). Plaintiffs appear to allege that precise nexus between ownership under an infringing name and trademark infringement and unfair competition claims
 
 
 [15]
 Plaintiffs cite the following factors as demonstrating that Express was the "alter ego" of A.G.: Directors and officers of Express also served A.G. in some capacity or were mere "figureheads." Heymann was a director of both corporations and sole owner of A.G., which in turn owned Express; Gregory Peters was a director of Express and financial advisor to A.G.; Wilkinson, Jr. was a director and president of Express while holding a written employment contract with A.G., the precise nature of which he would not disclose when deposed. Anthony Germano, a barber by trade, served as vice-president and director of Express; his only duties were to sign checks for the corporation and "sweep up the office."
 Express was grossly undercapitalized, and its funds were dissipated in unbusinesslike ways. The $50,000 paid in by A.G. in 1968 went towards the "wining and dining" of A.G.'s officers and directors who visited Las Vegas; personal loans were made to the officers and directors of both Express and A.G. Funds were commingled between the two corporations. The salaries and expenses of Express' directors and officers were paid directly by A.G., never by Express itself. When Express negotiated to purchase some property in Las Vegas, it did so as agent for A.G., and the check was signed by Peters and issued by the Meilis Establishment of Liechtenstein, of which Peters was president. Express made no profits during its entire existence. By the time the instant suit was filed against it, it had to borrow $10,000 from A.G. at 10% interest to finance the litigation; that loan has never been repaid. A.G. directly hired and paid the retainer for Jacobs, Express' lawyer in the instant action.
 Corporate formalities were minimally complied with by Express. Only pro forma records were kept; no Corporate Minutes Book was used; only one shareholder meeting was held up to the date of suit; and only one federal tax return was ever filed by Express, and that showed a loss.
 
 
 [16]
 Given that Express is incorporated in Nevada, has its principal place of business there, and if pierced will be pierced under Nevada law, North Arlington Med. Bldg., Inc. v. Sanchez Const. Co., 86 Nev. 515, 471 P.2d 240, 243 (1970), in a Nevada district court, we need not determine at this time whether the absence of any one of these factors would lead us to the conclusion that A.G.'s "alter ego" liability "arose" elsewhere than Nevada
 
 
 [17]
 As a practical matter, it may be difficult for plaintiffs to demonstrate that the sale was a sham. Occurring as it did before A.G. was served and without the possibility of A.G.'s foreseeing our acknowledgement of plaintiffs' stock ownership theory, there may have been little reason for A.G. to have rid itself of ownership. But see note 20 infra. Moreover, if Express is indeed a grossly undercapitalized corporate shell facing tremendous liabilities as plaintiffs maintain, a consideration of $100 may in fact be more than nominal
 
 
 [18]
 As already noted, see Part I.A.2. supra, plaintiffs allege that A.G. directly made two loans in California. The list of infringing and unfair activities allegedly carried on by A.G. and its European affiliates abroad is apparently much more extensive
 
 
 [19]
 In Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963), the Second Circuit held that, in diversity cases, state law as well as the due process clause of the fourteenth amendment determines under what circumstances an in-state defendant may be amenable to service in the manner prescribed by Rule 4(d)(3). See Republic Int'l Corp. v. Amco Engineers, Inc., 516 F.2d 161, 166 n.9 (9th Cir. 1975) (dictum as to Arrowsmith and Rule 4(d)(3)). See also Mechanical Contractors Ass'n v. Mechanical Con. A. of N. Cal., 342 F.2d 393, 398-99 (9th Cir. 1965) (looking to state law under Rule 4(e) only). Whatever the merits of the Arrowsmith construction of Rule 4(d)(3) in the diversity context, we hold that, in a federal question suit, Rules 4(f) providing for service within the territorial limits of the state in which the district court is held, and 4(d)(3) providing the manner for in-state service over foreign as well as domestic corporations, in combination give the district court the power and method of serving corporations which are present within the state under all circumstances consistent with the due process limits of the fifth amendment. See Fraley v. Chesapeake & Ohio Ry., 397 F.2d 1, 3-4 (3d Cir. 1968); Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 440-41 & n.3 (1st Cir. 1966); Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 548-49 (4th Cir. 1965); Lone Star Package Car Co. v. Baltimore & O.R. Co., 212 F.2d 147, 153-54 (5th Cir. 1954). See also Central Operating Co. v. Util. Workers, 491 F.2d 245, 250 n.5 (4th Cir. 1974); Aquascutum of London, Inc. v. S.S. American Champion, 426 F.2d 205, 210-11 & n.4 (2d Cir. 1970); note 7 supra
 Some of the cases cited in this section of our opinion were, however, bottomed on diversity jurisdiction and, therefore, dealt with state statutes under the Arrowsmith doctrine and the due process clause of the fourteenth amendment. But, given the broad reach of most of these modern state statutes, the fourteenth amendment ultimately became the only binding constraint; and, given that no case has interpreted the due process clause of the fifth amendment differently from that of the fourteenth in the context of interpreting the International Shoe line of authority, we rely on those cases also. In the final analysis, we are forced to agree that, "(i)n terms of actual results, Arrowsmith is much ado about nothing in the bulk of cases . . . ." 2 J. Moore, Moore's Federal Practice P 4.26, at 1183 (2d ed. 1976). See also 4 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1075 (1976).
 
 
 [20]
 Service on the in-state "general agent" is, of course, effective at that time against the principal. See Stanley Works v. Globemaster, Inc., 400 F. Supp. 1325, 1335-36 (D.Mass.1975); Scalise v. Beech Aircraft Corp., 276 F.Supp. 58, 63-64 (E.D.Pa.1967); Granite Chem. Corp. v. Northeast Coal & Dock Corp., 249 F.Supp. 597 (D.Me.1966). While it is not at all clear that plaintiffs intended to serve A.G. at the time they served Express, it would seem that a plaintiff need not know what larger entity he is serving before discovery of that fact and, therefore, should not be held to an intent standard. Moreover, it appears that A.G. actually received notice of the service on Express because A.G. at that time loaned Express $10,000 for litigation expenses and hired and paid Jacobs, Express' attorney in this suit. Such actual notice is a relevant consideration in determining that service on an agent in an otherwise proper manner was sufficient. See Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 332 F.2d 135, 141-43 (5th Cir.), cert. denied, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185 (1964); Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 669 (2d Cir. 1965); Fiat Motor Co. v. Alabama Imported Cars, Inc., 110 U.S.App.D.C. 252, 292 F.2d 745, 747, cert. denied, 368 U.S. 898, 82 S.Ct. 175, 7 L.Ed.2d 94 (1961); Orefice v. Laurelview Convalescent Center, Inc., 66 F.R.D. 136, 142-43 (E.D.Pa.1975). But see Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 166 (3d Cir. 1976)
 It would seem, however, that the only causes of action of which any defendant received notice from plaintiffs' first complaint were those arising out of Express' activities. But, even if A.G. no longer owned Express at the later time when A.G. itself was actually served, such lack of ownership would not be a barrier to a finding that, even at that late date, Express was still a general agent of A.G., thus rendering A.G. present in Nevada at that time. It may, however, prove to be a barrier to suing on activities other than those of Express under the "alter ego" theory of presence discussed in Part I.B.2. infra. Plaintiffs do, of course, attack the bona fides of the sale. See Part I.A.4. supra.
 
 
 [21]
 Although we note that Professor Moore may be remiss not stressing the possibility of a common law agency even as between totally independent corporations, see Part I.A.3. & note 13 supra, and in focusing on reaching an out-of-state parent rather than the absent part be it parent or subsidiary of the larger whole, we find that most cases do turn on the factors enumerated by him. Plaintiffs' allegations in this regard are detailed in note 15 supra. See also note 20 supra
 
 
 [22]
 In Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), Steele was an American citizen who imported watch parts from the United States into Mexico and there affixed to the completed watches the name "Bulova." Sales were confined to Mexico, but some purchasers of the watches carried them into the United States. By the time the case reached the Supreme Court, the Bulova Watch Company had secured the cancellation of Steele's Mexican trademark. In holding that the district court had jurisdiction under the Lanham Act to award relief, the Court reasoned that Congress could constitutionally regulate the foreign activities of American citizens, 344 U.S. at 285-86, 73 S.Ct. at 252; that the Lanham Act evidenced a congressional intent to exercise its power to the fullest, id. at 285-87, 73 S.Ct. 252; that Steele's foreign activities adversely affected Bulova's "trade reputation in markets cultivated by advertising here as well as abroad," id. at 286, 73 S.Ct. at 256; and that, owing to the cancellation of the Mexican trademark, the question "whether a valid foreign registration would affect either the power to enjoin or the propriety of its exercise" was not before the Court, id. at 289, 73 S.Ct. at 257. Contrary to the district court's reading of Bulova, the Supreme Court does not appear to have required a "substantial effect on commerce in the United States," 358 F.Supp. at 1076 (emphasis added)
 In Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956), the defendant was a Canadian corporation which had registered the name "Vanity Fair" in Canada. Plaintiffs, holders of that trademark in the United States, brought an action against the Canadian use of the name. Defendant's use of the name extended to the United States only in a few mail order sales and advertisements which crossed the border. Observing that the "Lanham Act itself gives almost no indication of the extent to which Congress intended to exercise its power in this area," the court nevertheless held that Congress did not intend that the infringement remedies of the Act should reach "acts committed by a foreign national in his home country under a presumably valid trademark registration in that country." 234 F.2d at 642. Plaintiffs were, however, allowed to amend their complaint to challenge only the United States sales and advertisements. Id. at 647-48.
 The facts of Ramirez & Feraud Chili Co. v. Las Palmas Food Co., 146 F.Supp. 594, 601-02 (S.D.Cal.1956), aff'd per curiam, 245 F.2d 874 (9th Cir. 1957), are very similar to those of the Bulova case. Ramirez presented an even stronger case for coverage than did Bulova, however, because defendants, American citizens, produced their counterfeit labels in the United States and sold their merchandise to American residents after affixing the labels in Mexico to goods produced there.
 
 
 [23]
 At last report of plaintiffs, the tally in foreign encounters stood as follows: Plaintiff Wells Fargo & Company has met with great success in West Germany and Austria against A.G., and in Italy and France against A.G.'s wholly-owned Irish subsidiary. Lesser success is reported in Liechtenstein against A.G. itself, and proceedings in Great Britain and South Africa against A.G., and in Spain against A.G.'s partially-owned Spanish subsidiary, were still awaiting resolution. Plaintiff Baker Industries has seemingly fared less well, losing to A.G. in Great Britain and to A.G.'s Spanish subsidiary in Spain
 Even in those instances in which a conflict may still exist between plaintiffs' and A.G.'s registration, the jurisdiction of the district court to issue an injunction is not necessarily foreclosed. See Ramirez & Feraud Chili, 245 F.2d 874 (9th Cir. 1957), aff'g per curiam and adopting by reference, 146 F.Supp. 594, 602 (S.D.Cal.1956); Bulova Watch Co. v. Steele, 194 F.2d 567, 571 (5th Cir.), aff'd without reaching the point, 344 U.S. 280, 289, 73 S.Ct. 252, 97 L.Ed. 319 (1952). See also Columbia Nastri & Carta Carbone v. Columbia R. & C. Mfg. Co., 367 F.2d 308, 312-14 (2d Cir. 1966).
 Plaintiffs have not, however, briefed or argued the question of what impact relevant international trademark conventions or treaties may have on this point. See 15 U.S.C. § 1126.
 
 
 [24]
 Plaintiffs argue here that the trial court's refusal to grant a default judgment against A.G. was an abuse of discretion if it was based on jurisdictional grounds. Citing United States ex rel. Motley v. Rundle, 340 F.Supp. 807 (E.D.Pa.1972), and Jones v. Jones, 217 F.2d 239 (7th Cir. 1954), they maintain that A.G. bore the burden of showing that the district court lacked subject matter and in personam jurisdiction. They reason that, since A.G. made no appearance, it failed to carry its burden on these issues, and, therefore, a default judgment should have been entered against it
 Neither case supports plaintiffs' argument. Both involved a subsequent proceeding in which the defendant attacked the entry of a default judgment against it, not the issue of when a default should be entered in the first instance. It is clear that plaintiffs bear the burden both of making an initial, prima facie showing of jurisdictional facts at the pleading stage and of proving those facts by a preponderance at trial. Milligan v. Anderson, 522 F.2d 1202, 1207 (10th Cir. 1975); Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 490-91 (5th Cir. 1974); O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176-77 & n.2 (7th Cir. 1971); United States v. Montreal Trust Co., 358 F.2d 239, 242 n.4 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). See Des Brissay v. Goldfield Corp., 549 F.2d 133, 136 (9th Cir. 1977); Taylor v. Portland Paramount Corp., 383 F.2d 634, 639 (9th Cir. 1967). See also Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 665 (1st Cir. 1972).
 Plaintiffs also challenge the district court's refusal to grant further discovery against A.G. Since we have vacated the district court's judgment on the issues of in personam jurisdiction over A.G. and subject matter jurisdiction over A.G.'s foreign activities, we also vacate the district court's refusal to grant discovery.
 We note, however, that a trial court does have jurisdiction to determine its own jurisdiction. United States v. United Mine Workers, 330 U.S. 258, 292 n. 57, 67 S.Ct. 677, 91 L.Ed. 884 (1947). And it is clear that a court may allow discovery to aid in determining whether it has in personam or subject matter jurisdiction. Lakkas v. Liberian M/V Caledonia, 443 F.2d 10 (4th Cir. 1971); Fraley v. Chesapeake & Ohio Ry., 397 F.2d 1 (3d Cir. 1968); Surpitski v. Hughes-Keenan Corp., 362 F.2d 254 (1st Cir. 1966); Urquhart v. American-La France Foamite Corp., 79 U.S.App.D.C. 219, 144 F.2d 542, 544, cert. denied, 323 U.S. 783, 65 S.Ct. 273, 89 L.Ed. 625 (1944); Leasco Data Processing Equip. Corp. v. Maxwell, 319 F.Supp. 1256, 1263 (S.D.N.Y.1970); Ziegler Chem. & Mineral Corp. v. Standard Oil Co. of Cal., 32 F.R.D. 241, 243 (N.D.Cal.1962); Metropolitan San. Dist. of Gr. Chicago v. General Elec. Co., 208 F.Supp. 943, 949-50 (N.D.Ill.1962); 4 J. Moore, Moore's Federal Practice P 26-56(6) (2d ed. 1976).
 The matter is generally left to the discretion of the trial court. H. L. Moore Drug Exch., Inc. v. Smith, Kline & French Lab., 384 F.2d 97 (2d Cir. 1967). An appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant; such a refusal is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction. Budde v. Ling-Temco-Vought, Inc., 511 F.2d 1033, 1035 (10th Cir. 1975). Discovery, however, "should be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary." Kilpatrick v. Texas & P. Ry., 72 F.Supp. 635, 638 (S.D.N.Y.1947). And discovery has been allowed, for example, where there was a question as to whether jurisdiction could be established over an alien corporation through the employment of another as agent. Davis v. Asano Bussan Co., 212 F.2d 558, 564-65 (5th Cir. 1954). See also General Ind. Co. v. Birmingham Sound Reproducers, Ltd., 26 F.R.D. 559 (E.D.N.Y.1961).